HARVEY JACOBSON AND MARCIA JACOBSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jacobson v. Commissioner
Docket No. 29856-85.
United States Tax Court
T.C. Memo 1988-341; 1988 Tax Ct. Memo LEXIS 370; 55 T.C.M. (CCH) 1437; T.C.M. (RIA) 88341; August 1, 1988; As amended August 1, 1988 Jerome R. Rosenberg, for the petitioners. Patricia A. Donahue, Mitchell B. Hausman, and Mildred M. Moon, for the respondent. WILLIAMS
*371 MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined a deficiency in petitioners' 1979 Federal income tax in the amount of $ 29,654. The issues we must decide are: (1) whether the transaction before us was devoid of economic substance, (2) whether petitioners are entitled to deduct certain interest; and (3) whether petitioners are liable for increased interest on an underpayment [Text Deleted By Court Emendation] attributable to a tax motivated transaction pursuant to section 6621(c). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Harvey Jacobson and Marcia Jacobson resided in New Fairfield, Connecticut when their petition was filed. Petitioners timely filed a joint Federal income tax return for the taxable year 1979, using the cash receipts and disbursements method of accounting. During the year in issue petitioner Harvey Jacobson was a real estate manager, and petitioner Marcia Jacobson was a doctor's assistant. Petitioner Harvey Jacobson acquired one-third *372 of a unit of the limited partnership Triad Associates ("Triad"), which is a 1.58333 percent interest in the profits and losses of Triad, in exchange for cash of $ 9,733.63 and two promissory notes dated October 29, 1979. One note, in the face amount of $ 20,755.16, was due March 15, 1980, and the other note, in the face amount of $ 6,845.66 was due January 15, 1981. These promissory notes were secured by an irrevocable letter of credit dated October 31, 1979. After payment of these two notes, petitioners' total cash contribution to Triad was $ 37,334.45. There is no record of other cash being contributed by petitioners to Triad. In the aggregate the limited partners including petitioner contributed $ 2,150,000 to Triad in 1979. Triad was a limited partnership formed under the laws of the State of New York. The partnership's purpose was to "acquire and exploit video tapes, motion pictures and motion picture rights." Daniel Glass, a practicing attorney, and Seymour Malamed served as the general partners of Triad. Each general partner contributed $ 2,500 to Triad. Both had significant experience in the motion picture industry. Daniel Glass had been general counsel and business *373 manager of Screen Gems, Inc., a subsidiary of Columbia Pictures, and was responsible for negotiating movie distribution and purchase agreements. In 1974 Glass began to organize limited partnerships and to acquire films for those partnerships. Many of the acquired films were financially successful. Seymour Malamed worked for Columbia Pictures for 20 years. After his departure, he began to form limited partnerships to acquire motion pictures. Some of these partnerships and the movies they acquired were profitable ventures. In 1979 Orion Pictures Company ("Orion") owned the motion picture "Promises in the Dark" ("Promises") which was produced in 1978. The story is set in a middle-sized Connecticut town and chiefly depicts the effect of a divorced, young woman doctor of the terminal illness and rapid degeneration of her teenage patient. The film stars Marsha Mason, known for her starring role in "The Goodbye Girl" for which she was nominated for an Academy Award. Promises was directed by Jerome Hellman, a successful producer, and was written by Loring Mandel a well-known script writer. The film is a slow-paced melodrama, and the screen play is full of trivial conversation and *374 shallow commentary. The subplots (the doctor's relationship with a male radiologist and the patient's relationships with her parents and boyfriend) are pedestrian, and the supporting characters are flat. In 1979 Orion entered into two simultaneous agreements with Triad. By agreement made on October 31, 1979 as of October 1, 1979 ("Purchase Agreement"), Triad acquired Promises from Orion for a purchase price of $ 6,130,000. This purchase price was determined by the actual production costs of the film which amounted to $ 6,284,842 as warranted by Warner Brothers, Inc. ("Warner"). Triad paid Orion $ 380,000 in cash at the closing and agreed to pay Orion $ 2,650,000 on September 30, 1986, together with interest at 6 percent per year, as evidenced by a promissory note delivered at closing that was purportedly recourse ("Purchase Note") in favor of Orion. By agreement dated October 29, 1979, petitioner and the other limited partners of Triad assumed their proportionate share of the Purchase Note executed by Triad for the film. Triad was entitled to apply against the unpaid principal balance of the Purchase Note adjusted gross receipts derived from television gross receipts after *375 the application of all other proceeds from Promises remitted to Triad pursuant to the Purchase Agreement. [2] Before the Purchase Agreement was entered into by the parties, Orion received $ 3,500,000 from CBS Entertainment for a license to broadcast Promises on television. This amount, after deduction of 25 percent distribution fee, substantially covered the principal balance of the Purchase Note. Consequently, neither Triad nor its limited partners who assumed the Purchase Note anticipated that any of them would be personally liable on the Purchase Note. We, therefore, find that the Purchase Note was nonrecourse. *376 Triad also issued Orion a nonrecourse promissory note in the face amount of $ 3,100,000 bearing interest at 6 percent per year due September 30, 1986 ("Nonrecourse Note"). The principal and interest on the Nonrecourse Note was payable solely out of "non-distributable gross receipts" as defined in the Purchase Agreement. The Purchase Agreement provides for payment of the Purchase Note and the Nonrecourse note as follows: Provided [Triad] is not in breach or default of any of its covenants, agreements, representations and warranties hereunder, the principal balance of the Nonrecourse Note, together with accrued interest thereon at the Agreed Rate and the accrued interest on the [Purchase Note], but not the principal amount thereof which shall be payable without restriction or limitation in accordance with the terms thereof, shall be payable to [Orion] only out of certain monies described below realized by [Triad] from the distribution of the Picture as and when same are remittable to the [Triad] pursuant to the Distribution Agreement hereinbelow described, in the following order: First, accrued interest not in excess of $ 2,315,000 on the [Purchase Note] and *377 on the Nonrecourse Note, in that order, shall be payable out of sums equal to the first "Adjusted Gross Receipts" exclusive of Adjusted Gross Receipts derived from television gross receipts (as those terms are defined in said Distribution Agreement or herein) but shall not exceed an amount equal to 12.2% of "Gross Receipts", then realized; and to the extent 12.2% of Gross Receipts (including television gross receipts) exceeds the amount applied to any interest pursuant to the preceding provisions of this clause First, such excess shall be applied to pay the principal of the [Purchase Note] when due (whether at maturity or upon accelleration) before the application of any other monies thereto. Second, accrued interest not in excess of $ 100,000 on the Nonrecourse Note shall be payable out of the first available sums equal to 26.2% of the "Net Receipts" (as that term is defined in said Distribution Agreement) available to Purchaser; Third, any accrued interest on the [Purchase Note] and the Nonrecourse Note remaining unpaid after the payments made on account thereof pursuant to "First" and "Second", above, shall be payable out of the "Non-Distributable Net Receipts" *378 (as that term is hereinafter defined); Fourth, the Non-Distributable Net Receipts remaining after payment of the amounts enumerated in "First" through "Third" hereinabove, but not in excess of $ 1,500,000, shall be applied to the payment of the outstanding principal balance at maturity of the [Purchase Note]. Fifth, the then outstanding principal balance of the Nonrecourse Note shall be payable out of the Non-Distributable Net Receipts remaining after provision for the amounts enumerated in "First" through "Fourth" hereinabove. The aforesaid sums shall be payable to [Orion] until the sums received by [Orion] are sufficient to pay in full the Debt Portion of the Purchase Price with interest thereon. For the purpose of this Paragraph 5, the term "Non-Distributable Net Receipts" shall mean sums equal to Seventy-three and eight tenths (73.8%) percent of the Net Receipts of the Picture as defined in that certain distribution agreement (the "Distribution Agreement") dated as of October 1, 1979 between [Triad] and [Orion] pursuant to which [Orion] has been granted the right to distribute the Picture throughout the universe as more particularly set forth therein, *379 after there shall have been deducted from said 73.8% sums equal to the interest paid or payable by the [Triad] and by certain of its partners on a loan from the Chemical Bank, New York (the "Bank") in principal amount not in excess of One Million Eight Hundred Fifty Thousand ($ 1,850,000) Dollars with interest at two (2%) percent over the Bank's prime rate from time to time, which loan is more particularly described in Appendix A to the Distribution Agreement. [3]
Subject to receiving all the right, title and interest in Promises as security for the Nonrecourse Note and the Purchase Note, Orion purported to transfer its right, title, and interest in Promises, including the copyright, to Triad but specifically excluded from the transfer: (a) Any of the literary, dramatic and/or musical material contained in the Picture or upon which the Picture is based and the copyrights thereto and any renewals and extensions thereof (all being hereinafter collectively *380 called the "Property"), except to the extent necessary to allow Purchaser to distribute the Picture throughout the universe; (b) Any television series rights, so-called television "special" rights, remake or sequel rights, or any other ancillary rights, and/or allied rights (including, without limitation, theatrical stage rights but specifically including the benefits of any merchandising, commercial tie-in rights, as provided below). (c) The right to enter into agreements with respect to the Property. (d) Any option rights with respect to the services of any person rendering services in or with respect to the production of the Picture. Triad entered into a Distribution Agreement dated October 1, 1979, with Orion by which Triad transferred back to Orion substantially all the rights it had acquired in the Purchase Agreement. Under the agreement Triad granted Orion all advertising and distribution rights and licenses in Promises, the right to alter and cancel contracts involving the distribution and exploitation of Promises, to adjust and settle all disputes with exhibitors and other contracting parties, and the right to make allowances and give credit to such parties. Triad *381 granted Orion in the Distribution Agreement the right to make foreign versions of Promises in Orion's sole discretion, and the exclusive right to submit Promises to any film festivals throughout the universe. Triad granted Orion the right to have on the screen of Promises and in all advertising and publicity for the film the following: "AN ORION PICTURES RELEASE through Warner Bros., A Warner Communications Company." Triad assigned to Orion all of its rights to publish synopses, summaries, resumes and excerpts from Promises and from all musical material, to broadcast adaptations of Promises of any kind, and to use the name, physical likeness, and voice of any party rendering services in Promises. Orion agreed to consult with Triad an to the initial United States theatrical advertising campaign, release date, and release pattern for the film, but Orion's decisions in these matters were final and binding. Pursuant to the Distribution Agreement Triad purported to pay Orion $ 3,000,000 on November 1, 1979, consisting of $ 1,800,000 to be used by Orion for advertising Promises, and $ 1,200,000 to defray Orion's costs of developing the marketing campaign for the film ("Marketing Strategy *382 Fee"). To cover these costs, Triad on November 1, 1979, obtained a "Marketing Loan" and an "Additional Financing Loan" from Chemical Bank in the amount of $ 1,850,000 and $ 1,656,080 respectively. The principal amount of the Marketing Loan was payable on January 1, 1981, and interest of 1 3/4 percent per annum in excess of Chemical Bank's prime rate was payable quarterly commencing January 2, 1980. The proceeds of the Marketing Loan were to be used to finance a portion of the marketing expenses to be incurred in connection with the release and distribution of Promises. The obligation under the Marketing Loan to pay principal and interest was satisfied solely out of Triad's right to receive "adjusted gross receipts" and "non-distributable net receipts" as defined in the Distribution Agreement. If the non-distributable net receipts of Promises were less than the amount of interest due on the Marketing Loan then Orion was to advance the difference as a nonrecourse loan to Triad with a right to recoup its payment only from future non-distributable net receipts. The Marketing Loan, was in effect, a nonrecourse obligation of Orion. The proceeds of the Additional Financing Loan *383 were used to pay the Marketing Strategy Fee. Principal and interest under the Additional Financing Loan was payable in two installments due January 15, 1980, and January 15, 1981. Interest was calculated at 1 1/2 percent in excess of Chemical Bank's prime rate. As security for repayment Triad pledged to Chemical Bank the letters of credit and/or certificates of deposit of the limited partners evidencing their original capital contributions. We find this note between Orion and Triad to be an exception to the prevailing pattern of paper transactions between Orion and Triad. The letters of credit and certificates of deposit contributed to Triad by the limited partners were pledged as security for the Additional Financing Loan. Triad's limited partners were actually liable on this Additional Financing Loan and satisfied their obligations. The Distribution Agreement provides that Orion was entitled to deduct from the "gross receipts" of Promises certain distribution fees. These distribution fees are provided in the agreement as follows: Distribution Fees: Orion (including its subsidiaries, affiliates or releasing company) shall be entitled to deduct from the gross receipts *384 of the Picture the following distribution fees which shall include all fees payable with [respect] to the Picture: A. From theatrical gross receipts in
the United States and Canada
30%
B. From theatrical gross receipts in
the United Kingdom
35%
C. From theatrical gross receipts in
Greece
45%
D. From theatrical gross receipts in
the rest of the universe
40%
E. From foreign theatrical gross receipts
derived from outright licenses of the Film
irrespective of the territory from which derived
15%
F. From non-theatrical and incidental gross
receipts derived from anywhere in the universe,
the same fee as is chargeable for theatrical
gross receipts in the country or territory concerned.
G. From television gross receipts in the United
States, Canada and the United Kingdom
35%
except that with respect to any sale or license of
the Film for free reception on television on a U.S.
national network basis to National Broadcasting
Company, American Broadcasting Company or CBS
Television Network, the distribution fee shall be
Twenty-Five (25%) Percent of the gross receipts
derived therefrom
H. From television gross receipts in the rest
of the universe
40%
*385 I. From non-theatrical gross receipts of the Film derived by a subdistributor or licensee anywhere in the universe, a sum equal to Fifteen (15%) Percent of such sums as are actually received from such subdistributor or licensee. J. With respect to gross receipts derived by Licensing Corporation of America in connection with merchandising, a sum equal to Fifty (50%) Percent thereof (after any third party royalties have first been deducted "off-the-top") shall be included in the gross receipts of the Film without any further distribution fee thereon. K. With respect to the sale (not subject to return) of sound track record albums of the Film in the United States, a sum equal to Five (5%) Percent of Ninety (90%) percent of the retail cover price shall be payable to the gross receipts of the Film with all approved third party record royalties payable out of said Five (5%) Percent, but in any event no less than a sum equal to Two (2%) Percent of Ninety (90%) Percent of the retail cover price shall be payable into the gross receipts of the Film without any distribution fee thereon. The foregoing is subject to such other customary terms and conditions as are applicable to sound *386 track album record royalties, including, without limitation, the payment of one-half (1/2) royalty rates for sales of the sound track album of the Film outside of the United States and a corresponding reduction of the royalty "floor" to one (1%) percent of ninety (90%) percent of the retail cover price. L. With respect to music publishing income from the Film, a sum equal to Fifty (50%) Percent of the net receipts derived from music publishing shall be payable to the gross receipts of the Film without any additional distribution fee, after said music publishing company shall have deducted from its gross receipts a sum equal to Fifteen (15%) Percent thereof as its administration fee, plus all direct costs. The fees set forth in subparagraphs A through I of this Paragraph 2 shall be reduced by 12.2 percentage points until gross receipts shall aggregate $ 18,975,000 or until "breakeven" (as that term is hereinafter defined) of the Picture, whichever shall first occur; and after "breakeven", the fees set forth in subparagraphs A, F and G of this Paragraph 2 shall be increased by 22.5 percentage points and the fees set forth in subparagraphs B, C, D, E, H and I of this Paragraph *387 2 shall be increased by 18.75 percentage points. In addition, after breakeven Orion shall be entitled to charge a fee of 87.5% on all merchandising, sound track record album and music publishing receipts. As used herein, the term "breakeven" shall mean that point at which "Non-Distributable Net Receipts" (as that term is hereinafter defined) of the Picture remittable to Producer shall aggregate an amount equal to the total of the following: (i) a sum equal to the interest payments made pursuant to Paragraph 6 hereinbelow; plus (ii) a sum equal to interest at 6% per annum on $ 4,600,000 from October 1, 1979 to date of remittance of said amount to Producer, less an amount equal to 12.2% of Gross Receipts not in excess of $ 18,975,000; plus (iii) a sum equal to $ 4,600,000. After deduction of the distribution fees, the remaining receipts of Promises are defined in the agreement as "adjusted gross receipts." Twelve and two-tenths percent of the first adjusted gross receipts of Promises was retained by Orion as interest on the Purchase Note. After the application of the first adjusted gross receipts the next $ 1,800,000 of adjusted gross receipts, was to be used to satisfy *388 the Marketing Loan to Chemical Bank pursuant too an assignment agreement dated October 31, 1979. The next $ 1,200,000 of adjusted gross receipts was payable to Triad in repayment of the Marketing Strategy Fee paid to Orion pursuant to the Distribution Agreement. From the balance of adjusted gross receipts remaining, Orion was entitled to deduct and retain its usual and customary distribution costs in connection with Promises in excess of $ 3,000,000. These costs include but are not limited to the costs of laboratory work and advertising expenses. After the last reduction of the adjusted gross receipts the remaining funds were the "producer's share of gross receipts." From this amount Orion would deduct and pay on its behalf all "third party participations." Third party participations were obligations of Orion to make certain payments to persons, firms, or corporations in connection with the production of Promises either as contingent deferments, or calculated on the basis of gross receipts and/or payable out of a portion thereof, and/or net profits derived from Promises. The terms "deferment," "gross receipts" and "net profits" for purposes of the separate third party participations *389 are defined in those agreements between Orion and third parties. These agreements have not been made a part of the record in this case. [4]
*390 Net receipts are defined as the remainder of the producer's share of gross receipts after the deduction of third party participations. Non-distributable net receipts are defined as 73.8 percent of all net receipts. Pursuant to the Purchase Agreement, the first $ 100,000 of distributable net receipts (26.2 percent of net receipts) was to be applied to pay interest on the Nonrecourse Note in favor of Orion. From the first available non-distributable net receipts, Orion was to pay on behalf of Triad the interest on the Marketing Loan to Chemical Bank. If the non-distributable net receipts of the film were insufficient to pay the interest due on the Marketing Note Orion was required to advance the sums necessary to pay the interest portion still outstanding. Such advances would be treated as nonrecourse loans between Orion and Triad, and Orion's only recourse was against non-distributable net receipts of the film. We find that in reality, Orion was liable for the interest on the Marketing Loan. The next $ 1,500,000 of non-distributable net receipts was to be applied by Orion to pay the unpaid principal balance of the Purchase Note. As recognized in Triad's private offering memorandum, *391 the film would have to realize gross receipts of $ 27,000,000 in order for the Triad's limited partners to fully recoup their investment. On November 2, 1979, Promises was released. The movie did not do well. Daniel Glass testified that after the initial release of Promises, the general partners of Triad had several meetings with the officers of Orion, including the head of marketing and the president, at which they complained that the picture was not being distributed vigorously. He testified that they tried to prod Orion to make more strenuous efforts to promote the picture because in December of 1979 Orion had not exhausted the $ 1,800,000 provided by the Partnership for marketing the picture. The general partners paid Orion $ 750,000 to keep the picture in release for at least four more months. Again the results were poor. We cannot determine from the record how much of the $ 1,800,000 Orion actually spent to advertise Promises, how much of the $ 1,200,000 Marketing Strategy Fee to defray Orion's costs of developing the marketing campaign of the film was spent to defray those costs or whether Triad actually paid Orion an additional $ 750,000 to keep Promises in release. *392 According to an affidavit of John A. Schulman, Vice President, General Counsel and Secretary of Warner Bros. Inc., as of June 30, 1987, the gross receipts from Promises totaled $ 6,273,383. According to Mr. Schulman, these were expended as follows: Reportable Gross Receipts (per statement No. 16)
$ 6,273,383
Distribution Fee
957,309
5,316,074
Applied to Interest on Purchase & Nonrecourse
Note + Principal of Purchase Note 12.2%
Reportable Gross Until $ 2,315,000
765,353
Available to pay Chemical Bank Loans to maximum
of $ 1,800,000
1,800,000
Retained by Orion and applied to Purchase Note
+ Chemical Bank Borrowing
1,200,000
Net Receipts
1,550,721
Amount Paid to Partnership (26.2%)
406,289
Excess Applied to Interest on the Marketing Note
1,144,432
$     -0-  Although the affidavit of Mr. Schulman was stipulated to by the parties, the disposition of the proceeds of Promises as reported in the affidavit diverges from the order required by the agreements entered into by Orion and Triad. For example, there is no mention of the producer's share of gross receipts from which third party participations *393 were to be paid to arrive at net receipts. Rather, the statement above skips this step by arriving at net receipts immediately after the deduction of distribution fees from gross receipts as provided in the Distribution Agreement. Moreover, some of the figures are combined making impossible a proper analysis of how the figures relate to the agreements entered into by the parties and of whether the income from the film was properly allocated between interest and principal due on the Purchase Note, the Nonrecourse Note, and the Marketing Loan pursuant to the agreements. Petitioners failed to provide any explanation of the statement in the affidavit reprinted above and failed to provide any proof of whether the receipts from Promises were in fact applied in accordance with the dictates of the Purchase Agreement and the Distribution Agreement. Consequently, we do not find Mr. Schulman's report of the distribution of proceeds to be reliable. Glass testified that in 1983 and 1984, the general partners of Triad objected to the accounting of receipts from the distribution of the picture by Orion. Supposedly the general partners objected to the deduction from adjusted gross receipts *394 of $ 3,000,000 even though not all of this sum had actually been spent by Orion and Warner for advertising and marketing the picture. This deduction purportedly resulted in a cash distribution to Triad $ 150,000 less than what the general partners believed was due. By agreement dated September 4, 1987, Orion retroactively extended the maturity dates of the two purchase notes made by Triad from September 30, 1986 to January 15, 1988. In a purchase agreement dated September 4, 1987, Triad purported to exchange its remaining rights in Promises to Orion-Warner Company for $ 285,000 cash and cancellation of the outstanding principal amount and accrued and unpaid interest on the Purchase Note and the Nonrecourse Note. On its 1979 partnership return of income Triad reported following: TOTAL INCOME
* $    4,959 Deductions
Depreciation
$   510,388
Amortization
2,012
Guaranteed Payments to Partners
8,167
Interest
28,302
Tax Advice
48,616
Advertising-Marketing
1,800,000
Distributor's Fee
1,200,000
Distribution Expense
4,000
Bank Charges
34
Total Deductions
10,892
3,612,856 Ordinary Loss
($ 3,607,897)
*395 In a tax opinion letter the law firm of Arnold and Porter concluded that there was a reasonable basis for those Federal income tax positions taken by Triad pursuant to the purported sale of Promises to Triad. In the tax opinion letter Arnold and Porter relied on information, representations and documents received from Glass and Malamed and undertook no independent inquiry to verify the facts and representations stated by Glass and Malamed. Accordingly, Arnold and Porter assumed that the purchase price of Promises did not exceed its fair market value, that the Purchase Note was fully recourse except with respect to interest, that Triad was engaging in the transactions with a view to making an economic profit without relying on the tax consequences of the transactions, and that Triad had a legitimate business purpose when entering the transactions. We find these assumptions to be erroneous. Petitioners deducted $ 57,125 on their 1979 Federal income tax return pursuant to their interest in Triad. [5] Petitioners also claimed a distributive share of investment tax credit from Triad in the amount of $ 3,198. Respondent disallowed the distributive share of the loss and the investment *396 tax credit and characterized the alleged underpayment of tax as a substantial underpayment attributable to tax motivated transactions under section 6621(c). OPINION The first issue we must decide is whether the transaction before us lacks economic substance. A transaction is without its intended effect for Federal income tax purposes if it is devoid of economic substance consonant with its intended tax effects. ; ; . A transaction does not have economic substance if a realistic potential for profit, apart from Federal income tax benefits, does not exist. . Moreover, to have economic substance the transaction must be compelled by business realities rather than by tax avoidance features *397 with meaningless labels. . Several factors indicate that the various agreements entered by Triad with Orion are devoid of economic substance and should be ignored for Federal income tax purposes. First, on considering the expert testimony presented at trial, and after viewing the movie, we believe that Promises could not be a profitable film and that it was not reasonable for petitioner to anticipate a profit on his investment in Triad apart from Federal income tax benefits. The private offering memorandum informed the investors that, to recoup their cash investment in Triad, Promises would have to realize $ 27,000,000 in gross receipts. Considering the film's trivial and shallow screenplay, its depressing and downbeat theme without offsetting character development, and its slow pace, Promises was discernibly not going to be a "blockbuster." We concur with respondent's expert that it was manifestly impossible for the film to generate gross receipts of $ 27,000,000. A realistic potential for profit does not require that a particular transaction make a profit or that similar transactions generally are *398 profitable. A realistic potential for profit is present "when the transaction is carefully conceived and planned in accordance with standards applicable to the particular industry, so that, judged by those standards the hypothetical reasonable businessman would make the investment." . No doubt the movie industry is full of risk and unpredictable fortune; approximately only one out of every five films are profitable. See . This investment was made, however, after the film was ready for distribution, and to reasonable investors the film was discernibly mediocre. This magnified the risk and reduced the unpredictability of Promises generating $ 27,000,000 in gross receipts to certain failure. Petitioners argue that both creatively and commercially Promises had all the elements of a successful film. Promises starred Marsha Mason, a reputable actress who, just prior to the production of Promises, had been nominated for an Academy Award. The film was directed and produced by Jerome Hellman, a major producer with significant experience in the motion picture industry. Furthermore, *399 the script of the film was written by Loring Mandel, an experienced and well-known script writer. Petitioner contends that all of these elements in concert created a reasonable expectation of profit. We agree that these elements would indicate a reasonable profit potential before Promises was produced, but Triad purchased the film after its completion and after it was viewed by Triad's general partners Glass and Malamed. With the benefit of seeing the finished product and with all of their experience in the movie industry, Glass and Malamed could not have reasonably believed that Promises would be a profitable film. Our conclusion is based substantially on the testimony of respondent's expert William A. Madden which was confirmed by our viewing of the film. Based on the film's slowly paced, morbid story line, the mediocre performance of the cast (aside from Marsha Mason), the failure to develop the characters, and the lack of success of prior films on cancer and euthanasia, we agree with Madden's conclusion that Promises had no domestic or foreign theatrical value. He stated that the picture's gross receipts would not exceed its high cost of marketing and distribution. The *400 quality and subject matter of Promises and the high cost of marketing and distribution of the film, combined with the fact that Triad acquired relatively few valuable rights in Promises pursuant to the Purchase and Distribution Agreements lead us to the conclusion that there was no realistic possibility that petitioners would receive back their investment in Triad (aside from tax benefits). Another indication of the lack of economic substance of the transaction before us is that the stated purchase price of Promises was not within the reasonable range of the film's fair market value. This purchase price of $ 6,130,000 was determined by Glass and Malamed based upon the production cost of the film rather than on a professional appraisal of its fair market value. While production cost is relevant in determining the fair market value of a film, , it is not the only factor in the determination. Spending money may enhance the chances of producing a successful film, but it does not follow that its mere expenditure results in any value. Respondent's expert William A. Madden considered the story and script, the producer-director, *401 the cast and performance, photography and color, musical score and sound, editing, and the overall production value. He concluded that the film had no domestic or foreign theatrical value despite its production costs. We found Mr. Madden's analysis to be sound, persuasive and the most credible of all the expert evaluations presented at trial. Respondent's other expert, Robert A. Newgard, estimated the fair market value of Promises to be $ 1,850,000. In arriving at this value Mr. Newgard analyzed the markets of network television, syndication, cable, and other ancillary markets. While we found his testimony credible, much of his analysis included profit potential from markets that Triad could not exploit. For example, his analysis included rights that the Purchase Agreement excluded from the transfer of rights in Promises such as: any television series rights, television special rights, remake or sequel rights and any other ancillary rights including theatrical stage rights, and the benefits of any merchandising and commercial tie-in rights. Although Newgard found the fair market value of the film to be $ 1,850,000, a figure much less than the purchase price of $ 6,130,000, *402 we find the film's value to be even less because of the conditions subject to which Triad acquired Promises. At trial petitioner presented Max E. Youngstein, Maurice Silverstein, and Marvin M. Grieve as expert witnesses. We found their testimony to be unpersuasive. Youngstein estimated the fair market value of Promises to be $ 7,000,000. When asked to explain some of the figures on which he based this conclusion, Youngstein in effect refused. We have, therefore, disregarded his testimony. Silverstein estimated the fair market value of Promises to be $ 4,000,000 based upon his estimated foreign theatrical gross receipts of $ 4,000,000. Silverstein's estimate of fair market is erroneous because it ignores the costs both of the film and of its distribution. Grieve estimated that the gross receipts from the television and ancillary rights of Promises would be $ 4,300,000 to $ 5,300,000 resulting in a "net producer's share" of $ 2,800,000 to $ 3,450,000. Based on this estimation, he stated that pursuant to the Purchase and Distribution Agreements 46 to 55 percent of the purchase price of Promises would be covered by the receipts from television, and therefore the purchase of *403 Promises for $ 6,130,000 was a good investment. He testified that the fair market value of Promises was between $ 2,800,000 and $ 3,450,000. Grieve's evaluation ignored the $ 3,000,000 of additional advertising and marketing fees that Triad paid to Orion. Consequently, we find Grieve's evaluation of the film's fair market value to be erroneous. We conclude that Promises had no domestic or foreign theatrical value and that the film's purchase price of $ 6,130,000 was not within the reasonable range of Promises' fair market value. To purchase Promises, Triad paid Orion $ 380,000 in cash and executed two notes in favor of Orion in the amounts of $ 2,650,000 and $ 3,100,000. Interest on both these notes was payable solely out of the proceeds from the exploitation of Promises, and the principal amount of the Nonrecourse Note was payable solely from the gross receipts of the film. The principal amount of the Purchase Note was payable out of the $ 3,500,000 received from the sale of Promises to CBS if the principal amount of the Purchase Note remained unpaid after all other proceeds were applied to the Purchase Note in accordance with the Purchase and Distribution Agreements. The *404 Purchase Note was eventually cancelled. Therefore, the partners of Triad were not personally liable on the Purchase Note. Consequently, all the notes used to purchase Promises were nonrecourse notes which were greatly in excess of the fair market value of the film. Neither Triad nor its partners would ever be required to pay the full purchase price of Promises. This is not the "stuff of substance." , affg. on other grounds . Furthermore, on September 4, 1987, Orion purportedly reacquired Triad's rights in Promises for cash of $ 285,000 and a forgiveness of the two notes used to purchase the film originally. In reality, Orion never really parted with any substantive rights in Promises because of the rights it retained pursuant to the Purchase Agreement and the rights Triad putatively transferred back to Orion pursuant to the Distribution Agreement. With the additional fact that the Purchase Note and Nonrecourse Note were forgiven, we further conclude that the stated purchase price of Promises was never intended to be paid. Petitioner has not offered any evidence *405 that has persuaded us otherwise. Petitioner invested $ 37,334.45 in Triad. In 1979 petitioner received $ 29,654 in tax benefits, completely recovering his 1979 cash outlay of $ 9,733.63 and recouping over 75 percent of his investment in Triad. These tax benefits were maximized by the overstated purchase price of Promises and by the use of notes in the transaction that were nonrecourse, never paid, or were cancelled. We find that the role of Triad in the transaction served no credible business purpose. The transaction at issue was a mere paper chase compelled by tax avoidance features rather than by business realities. Apart from Federal income tax benefits the transaction entered into by petitioner had no realistic potential for profit. Consequently, we hold that the transaction at issue is devoid of economic substance and should be ignored for Federal income tax purposes. The next issue we must decide is whether petitioner may deduct his proportionate share of interest and commitment fees paid by Triad in the amount of $ 28,302. This sum consists of $ 20,978.01 of interest and $ 1,518.07 of commitment fees on the Additional Financing Loan and $ 4,959.03 of interest and *406 $ 1,695.83 of commitment fees on the Marketing Loan. The sum also includes $ 332.88 of interest and an interest credit of $ 1,182.23. Petitioner has adequately substantiated the interest and commitment fee expenses. However, we hold that the interest payments and the commitment fees attributable to the Marketing Loan are not deductible by Triad. The interest and principal of the Marketing Loan was payable solely out of the proceeds of the film, and we have found that Orion was the true obligor on this loan. Interest was payable to Chemical Bank from gross receipts. If gross receipts were unavailable, Orion would pay the interest out of its own resources and deem the payment to be a nonrecourse loan to Triad. Triad did not pay the interest and commitment fees attributable to the Marketing Loan. A taxpayer may not deduct the interest on the obligations of others. . These obligations in reality belonged to Orion. Accordingly, the amounts paid on the Marketing Note as interest and commitment fees are not deductible by Triad pursuant to section 163. This includes $ 332.88 in "interest" which petitioner, *407 having the burden of proof, failed to prove was paid and attributable to the Additional Financing Loan. The interest and commitment fees attributable to the Additional Financing Loan on the other hand are deductible pursuant to section 163(a). The final issue we must address is whether petitioner is liable for interest under section 6621(c). Section 6621(c) provides that the interest payment under section 6601 with respect to any substantial underpayment attributable to a tax-motivated transaction shall be 120 percent of the adjusted rate established under section 6621(b). A substantial underpayment is defined as an underpayment of income tax exceeding $ 1,000. Section 6621(c)(2). The term "tax-motivated transaction" includes any sham transaction. Section 6621(c)(3)(A)(v). This case involves an underpayment of Federal income tax for the taxable year 1979 exceeding $ 1,000 and we have interpreted section 6621(c)(3)(A)(v) to include transactions which are without economic substance. . The substantial underpayment of income tax in this case is attributable to a transaction lacking in economic substance. Accordingly, we hold *408 that petitioner is liable for interest on substantial underpayments attributable to tax motivated transactions. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect during the year in issue, unless otherwise indicated. ↩
2. The Distribution Agreement provides in Exhibit A, paragraph 3, subparagraph V: Notwithstanding anything contained in this paragraph 3 to the contrary [Triad] shall be entitled from adjusted gross receipts derived from television gross receipts to an amount equal to the unpaid principal amount of the [Purchase Note] when due (whether upon maturity or by way of acceleration) after application of all other proceeds remitted or remittable to [Triad] and applied in reduction of the principal amount of said [Purchase Note]. Any payment made pursuant to this subparagraph V shall not constitute a reduction of Adjusted Gross Receipts in computing the amount of Net Receipts hereunder but shall not affect Orion's right to recoup the balance of the distribution costs and expenses paid or incurred pursuant to subparagraph IV of this paragraph 3. ↩
3. The Purchase Agreement was reformed by hand. These reformations are not entirely clear on the copy of the Purchase Agreement in the record. We have reprinted the Purchase Agreement with the changes as they appear to us. ↩
4. The following are the third party participations payable with respect to Promises: (a) To Jerome Hellman Films, Inc. (the Producer of the Picture) a $ 150,000 contingent deferment, pari passu with other deferments, plus 32% of 100% of net profits; (b) To Marsha Mason, 7-1/2% of 100% of the net profits; (c) To Ned Beatty, a $ 25,000 contingent deferment, pari passu with other deferments; (d) To Susan Clark, a $ 25,000 contingent deferment, pari passu with other deferments; (e) To Kathleen Beller, a $ 10,000 contingent deferment, pari passu with other deferments; plus 1% of 100% of the net profits of the film. (f) To Loring Mandel, a $ 25,000 contingent deferment, pari passu with other deferments; plus 5% of 100% of the net profits of the film (g) To Sheldon Schrager (production manager and executive producer) 2-1/2% of 100% of the net profits of the film. (h) To Ann Roth (costume designer) 1% of 100% of the net profits. (i) To Lynn Stallmaster & Associates (casting) 1% of 100% of the net profits. ↩
*. 1979 income derived from receipt of interest. ↩
5. Petitioners reported income/loss in later years from their investment in Triad as follows: ↩
Income/Loss
1980
[$ 47,184]
1981
6,503 1982
[  11,342]
1983
[  11,332]
1984
593 1985
[439]
1986
[325]