Harvey JACOBSON and Marcia Jacobson, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Defendant–Appellee.

No. 155, Docket 89–4057.

United States Court of Appeals, Second Circuit.

Argued Oct. 6, 1989.

Decided Oct. 5, 1990.

Walter J. Rockler, Washington, D.C. (Richard L. Hubbard, Arnold & Porter, Washington, D.C., of counsel), for petitioners-appellants.

Charles Bricken, Atty., Tax Div., Dept. of Justice, Washington, D.C. (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, David English Carmack, Attys., Tax Div., Dept. of Justice, Washington, D.C., of counsel), for defendant-appellee.

Before NEWMAN, PRATT and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Harvey and Marcia Jacobson[1] appeal from an order and decision of the United States Tax Court, B. John Williams, Jr., *Judge*, entered February 2, 1989 that determined (1) a federal income tax deficiency for 1979 in the amount of $29,444, and (2) that the entire deficiency constituted a substantial underpayment attributable to a tax-motivated transaction for purposes of computing the interest payable with respect to the deficiency, pursuant to 26 U.S.C. § 6621(c) (1988), formerly § 6621(d).[2] The memorandum opinion of the Tax Court is reported as *Jacobson v. Commissioner*, 55 T.C.M. (CCH) 1437 (1988).

The Tax Court, substantially upholding an assessment by the Commissioner of Internal Revenue (the "Commissioner"),[3] found that the acquisition of the motion picture *Promises in the Dark* ("*Promises*") by Triad Associates ("Triad"), a limited partnership, was devoid of economic substance and should be ignored for federal income tax purposes. The court accordingly disallowed a loss of $57,125 shown on Jacobson's 1979 tax return as his distributive share of Triad's 1979 tax loss, and an investment tax credit of $3,198 attributable to Jacobson's interest in Triad.

We reverse and remand.

## Background

In October 1979, Jacobson acquired one-third of a unit of Triad, representing a 1.58333 percent interest in the profits and losses of Triad. The purchase price was $37,334.45. $9,733.63 was paid in cash, and the remainder was in the form of two promissory notes, one in the amount of $20,755.16 due March 15, 1980 and one in

---

1. Marcia Jacobson is a party because she filed a joint federal income tax return with her spouse Harvey Jacobson ("Jacobson") for 1979.

2. Statutory references hereinafter are to the Internal Revenue Code of 1954 (26 U.S.C.) as amended and in effect during 1979. The Code has since been redesignated as the Internal Revenue Code of 1986. *See* Tax Reform Act of 1986, Pub.L. No. 99–514, § 2, 100 Stat. 2085, 2095.

3. The Commissioner's notice of deficiency specified a deficiency of $29,654. The order and decision of the Tax Court from which this appeal is taken determined a deficiency of $29,-444. This variation apparently resulted from the Tax Court's determination that Jacobson was entitled to deduct his distributive share of certain interest and commitment fees attributable to an Additional Financing Loan hereinafter described, pursuant to section 163(a). *See* 55 T.C.M. at 1445.

the amount of $6,845.66 due January 15, 1981, both secured by an irrevocable letter of credit dated October 31, 1979.

Triad was a New York limited partnership formed on August 13, 1979 to acquire, own and exploit motion pictures. *Promises* was the only film acquired, although it was originally intended that Triad acquire two additional films, *Heartbeat* and *Ten*. Triad's two general partners were Daniel Glass and Seymour Malamed, both of whom had significant experience in the motion picture industry and in organizing limited partnerships to acquire and distribute films.

Glass was an attorney who had practiced for over thirty years in the entertainment industry, particularly in motion pictures and television. He had been general counsel and business manager of Screen Gems, Inc., a subsidiary of Columbia Pictures, and was responsible for negotiating movie distribution and purchase agreements. Malamed had been a consultant to the movie industry since 1975, and for twenty years prior thereto was an officer of Columbia Pictures, where his positions included the following: executive vice president-administration, 1973–1975; vice president-finance, treasurer, and chief administrative officer, 1971–1973; vice president, treasurer, and chief financial officer, 1963–1971. In the five years preceding the transaction at issue herein, both had acted as general partners of other partnerships which had financed the production of, or purchased, numerous motion pictures, many of which had been commercially successful.

Orion Pictures Company ("Orion") owned *Promises*, a completed motion picture. *Promises* featured actress Marsha Mason, whose starring role in *The Goodbye Girl* resulted in an Academy Award nomination. *Promises* was directed by a successful producer, Jerome Hellman, and the screenplay was written by Loring Mandel, a well known script writer who had won an Emmy

Award. The film was described in one of Triad's offering documents as follows:

> The picture is set in a middle sized town in Connecticut and depicts the effect on a young doctor (Marsha Mason) of the terminal illness of a teenage girl patient and the relationship of the doctor with her hospital colleagues as well as the relationship of both doctor and patient with the girl's family and friends, involving all of the emotional conflicts and moral dilemmas in such a situation.

Glass and Malamed viewed *Promises*, and decided that Triad would purchase the film from Orion.

Triad simultaneously entered into two agreements with Orion, a Purchase Agreement and a Distribution Agreement, as of October 1, 1979. In the Purchase Agreement, Orion sold *Promises* to Triad, retaining certain rights,[4] for $6,130,000. The purchase price was based upon the actual production costs of the film, which were warranted by Warner Brothers, Inc. ("Warner Brothers"), successor to Orion as distributor of the film, and Orion to be $6,284,842. Of this amount, Triad was to pay $380,000 at closing, with the balance in the form of two nonnegotiable promissory notes: a full recourse note in the amount of $2,650,000 (the "Recourse Note") and a nonrecourse note in the amount of $3,100,000 (the "Nonrecourse Note"). Both notes were payable on September 30, 1986, bore interest at 6% per annum, and were secured by a lien on *Promises*.

Interest on both notes, and the principal amount of the Nonrecourse Note, were to be paid solely out of receipts resulting from the distribution of *Promises*. Each limited partner of Triad assumed primary liability for that partner's pro rata share of the principal of the Recourse Note.

The Distribution Agreement conveyed from Triad back to Orion "all advertising, distribution, exhibition and exploitation rights and licenses" in *Promises*. Triad undertook to advance to Orion the first

---

**4.** Orion excluded the following rights in *Promises* from the sale to Triad: rights in literary, dramatic or musical material (except to the extent necessary to distribute *Promises* throughout the universe); television series, special, remake or sequel rights; theatrical stage rights; the right to enter into agreements with respect to *Promises;* and option rights with respect to persons rendering services in the production of *Promises*.

$1,800,000 of advertising costs for the film, and to pay Orion a marketing strategy fee in the amount of $1,200,000. These amounts were to be recouped from the proceeds of the distribution of *Promises*, in accordance with a complicated formula set forth in Exhibit A to the Distribution Agreement.

Exhibit A to the Distribution Agreement also provided that Triad would be entitled to be paid from *Promises'* television receipts "an amount equal to the unpaid principal amount of the Recourse note when due (whether upon maturity or by way of acceleration) after application of all other proceeds remitted or remittable to [Triad] and applied in reduction of the principal amount of said Recourse Note." The television receipts payable to Triad were those remaining after payment of Orion's distribution fee, which was contractually defined as twenty-five percent for a sale or license for free television reception on a national network, subject to downward and upward adjustments depending upon the timing of the fee in relation to total gross receipts generated by *Promises*.[5]

In order to finance the $1,800,000 advertising advance and $1,200,000 marketing strategy fee, respectively, Triad obtained a "Marketing Loan" in the amount of $1,850,000 and an "Additional Financing Loan" in the amount of $1,656,080 from Chemical Bank. The Marketing Loan was a nonrecourse obligation, with principal and interest to be satisfied solely out of Triad's right to receipts from the commercial exploitation of *Promises*. If those receipts were inadequate to meet any interest payment, Orion was to advance the difference to Chemical Bank, and was entitled to re-coup any such advance from future receipts generated by *Promises*.

The Additional Financing Loan, on the other hand, was a recourse obligation as to which each limited partner of Triad was personally obligated for his proportionate share of the principal amount. As security for payment, Triad pledged to Chemical Bank the letters of credit and certificates of deposit that Triad had received as security for payment of the limited partners' capital contributions.

Since Triad would recoup its investment and realize profits from the commercial exploitation of *Promises* only after the payment of (1) Orion's distribution fees and expenses, (2) the principal and interest of various indebtedness, and (3) profit participations to such third parties as Marsha Mason and Jerome Hellman, it was, according to Triad's private offering memorandum, "anticipated that the [limited partners of Triad] will not recoup their investment in [Triad] unless and until Gross Receipts [from the commercial exploitation of *Promises*] equal at least $27,000,000."

*Promises*, which was released on November 2, 1979, was not commercially successful, although it was accorded some favorable critical reviews; its receipts totaled only $6,273,383 as of June 30, 1987. Ultimately, Triad sold *Promises* back to Orion in 1987 for $225,000 and cancellation of the unpaid balance of the Recourse and Nonrecourse Notes.[6]

On its 1979 federal income tax return, Triad reported income in the amount of $4,959 and deductions in the amount of $3,612,856, resulting in an ordinary loss of $3,607,897. Jacobson deducted a distributive share of this loss, $57,125, on the 1979

---

**5.** At the time the Purchase Agreement and Distribution Agreement were executed, Orion had a contract with CBS calling for a license fee of $3,500,000 for two network broadcasts of *Promises*. The Tax Court erroneously found that CBS had paid this amount to Orion prior to execution of these agreements, thereby concluding that since "[t]his amount, after deduction of 25 percent distribution fee, substantially covered the principal balance of the [Recourse] Note," the Recourse Note was in fact nonrecourse. *See* 55 T.C.M. at 1438. On appeal, Jacobson contends that the Tax Court's factual error, together with various contractual contingencies relating to the CBS payment, require reversal of the Tax Court's ruling that the Recourse Note was in fact nonrecourse. The Commissioner contends that the Tax Court ruling should be upheld because the CBS payment was to be made before the principal balance of the Recourse Note became payable, and the contractual contingencies regarding that payment were insubstantial.

**6.** The Tax Court opinion incorrectly stated that the amount of the cash payment was $285,000. *See* 55 T.C.M. at 1442.

federal income tax return at issue in this litigation. He also took an investment tax credit in the amount of $3,198 as his distributive share of Triad's 1979 investment tax credit of $202,000.

In a statutory notice of deficiency dated May 30, 1985, the Commissioner disallowed the deduction and credit, asserting that the acquisition of *Promises* was not an activity entered into for profit under section 183(a). The Commissioner also disallowed, duplicatively, certain components of the partnership loss: *i.e.*, deductions for depreciation, tax advice, advertising—marketing, distribution fees, interest expense and other expenses. The Commissioner further determined that the resulting underpayment was a substantial underpayment attributable to a tax motivated transaction under section 6621(d), resulting in a penalty interest rate on the underpayment of 120% of the normal rate imposed by section 6621.

Jacobson filed a timely petition for redetermination of the asserted deficiency in the Tax Court. Jacobson maintained that (1) the Triad loss of $3,607,897 for 1979 resulted from legitimate deductions for depreciation and for ordinary and necessary business expenses, (2) Triad's investment tax credit of $202,000 for 1979 was similarly legitimate, and (3) Jacobson's adjusted basis in his partnership interest in Triad equaled or exceeded $57,125; and that the disallowance of Jacobson's loss deduction and investment tax credit were accordingly improper.

In an amended answer to Jacobson's petition, the Commissioner alleged, *inter alia,* as additional grounds in support of the asserted deficiency, that Triad did not have sufficient benefits and burdens of ownership in *Promises* to entitle the partnership to the tax benefits of ownership of the film, that Triad's payment for *Promises* unreasonably exceeded the film's fair market value, and that the obligation represented by the Recourse Note was speculative and contingent.

The Tax Court upheld the Commissioner. In doing so, the court made, *inter alia,* the following "findings of fact":

The film is a slow-paced melodrama, and the screen play is full of trivial conversation and shallow commentary. The subplots (the doctor's relationship with a male radiologist and the patient's relationships with her parents and boyfriend) are pedestrian, and the supporting characters are flat.

55 T.C.M. at 1437.

The court later elaborated, stating:

Considering the film's trivial and shallow screenplay, its depressing and downbeat theme without offsetting character development, and its slow pace, Promises was discernibly not going to be a "blockbuster." We concur with respondent's expert that it was manifestly impossible for the film to generate gross receipts of $27,000,000.

*Id.* at 1443.

The court continued in the same vein:

With the benefit of seeing the finished product and with all of their experience in the movie industry, Glass and Malamed could not have reasonably believed that Promises would be a profitable film.

Our conclusion is based substantially on the testimony of respondent's expert William A. Madden which was confirmed by our viewing of the film. Based on the film's slowly paced, morbid story line, the mediocre performance of the cast (aside from Marsha Mason), the failure to develop the characters, and the lack of success of prior films on cancer and euthanasia, we agree with Madden's conclusion that *Promises* had no domestic or foreign theatrical value. He stated that the picture's gross receipts would not exceed its high cost of marketing and distribution. The quality and subject matter of Promises and the high cost of marketing and distribution of the film, combined with the fact that Triad acquired relatively few valuable rights in Promises pursuant to the Purchase and Distribution Agreements lead us to the conclusion that there was no realistic possibility that petitioners would receive

back their investment in Triad (aside from tax benefits).

*Id.* at 1444.

The Tax Court concluded:

The transaction at issue was a mere paper chase compelled by tax avoidance features rather than by business realities. Apart from Federal income tax benefits the transaction entered into by petitioner had no realistic potential for profit. Consequently, we hold that the transaction at issue is devoid of economic substance and should be ignored for Federal income tax purposes.

*Id.* at 1445.

The Tax Court also ruled that Jacobson's distributive share of certain interest and commitment fees paid by Triad with respect to the Marketing Loan were not deductible because Orion was the true obligor thereon, but that interest and commitment fees attributable to the Additional Financing Loan were properly deductible pursuant to section 163(a). *Id.; see supra* note 3. Finally, the Tax Court sustained the Commissioner's determination that the resulting deficiency constituted a substantial underpayment of tax attributable to a tax motivated transaction for which a penalty interest rate under section 6621(d) should be assessed. *Id.*

This appeal followed.

### Discussion

The primary issue which we must consider on this appeal is whether the Tax Court correctly determined that the transaction at issue was "devoid of economic substance and should be ignored for Federal income tax purposes." 55 T.C.M. at 1445. We reverse this determination, and remand for reconsideration of Jacobson's liability for federal income tax in 1979, as hereinafter specified.

A. *The "Economic Substance" of the Acquisition of Promises.*

 While the Tax Court's conclusion that the acquisition of *Promises* lacked economic substance is a finding of fact to be reviewed for clear error, the legal standard applied by the Tax Court in making this

determination is reviewed *de novo.* See *Sochin v. Commissioner,* 843 F.2d 351, 353 (9th Cir.), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988); *see also Bailey v. Commissioner,* 912 F.2d 44, 47 (2d Cir.1990); *American Realty Trust v. United States,* 498 F.2d 1194, 1198 (4th Cir.1974).

The question whether a transaction is devoid of economic substance is often analyzed in terms of its being "sham." A sham transaction analysis requires a determination "whether the transaction has any practicable economic effects other than the creation of income tax losses." *Rose v. Commissioner,* 868 F.2d 851, 853 (6th Cir. 1989); *see Sochin,* 843 F.2d at 354. "A transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions." *DeMartino v. Commissioner,* 862 F.2d 400, 406 (2d Cir.1988).

Such cases are also considered in terms of the section 183(a) provision that where an "activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter" except to the limited extent specified in section 183(b). In *Smith v. Commissioner,* 91 T.C. 733 (1988), the Tax Court explained the interplay between an "economic substance" analysis and the mandates of section 183 as follows:

*Profit Objective and Economic Substance*

Determination of whether an activity is undertaken for profit is generally referred to as involving a "section 183 issue." Section 183 initially served to distinguish between business objectives and personal objectives, but in recent years has been used frequently to compare business objectives with tax objectives. See generally *Brannen v. Commissioner,* 78 T.C. 471, 506–07 (1982), aff'd. 722 F.2d 695 (11th Cir.1984); *Jasionowski v. Commissioner,* 66 T.C. 312, 321 (1976). In *Rose v. Commissioner,* 88 T.C. 386, 414 (1987), [aff'd, 868 F.2d 851 (6th Cir. 1989),] we adopted a unified test of economic substance incorporating factors considered relevant in cases decided un-

der section 183. The *Rose* approach was a restatement of prior law, particularly identifying objective factors examined under various theories by which [the Commissioner commonly] challenges the tax treatment of transactions. "Reliance on these objective factors enables us to focus our scrutiny on the actual mechanics of the transactions, rather than on an ephemeral analysis of subjective intentions." *Rybak v. Commissioner*, 91 T.C. 524, 535 (1988).

91 T.C. at 753–54.

In any event, whether the terminology employed is that of economic substance, sham, or section 183 profit motivation, we regard the methodology used by the Tax Court in the instant case as fundamentally flawed, and setting a dangerous precedent. Approximately one movie in ten is a commercial success. *See Cherin v. Commissioner*, 89 T.C. 986, 993 (1987) (citing *Abramson v. Commissioner*, 86 T.C. 360, 369 (1986)). The regulations issued by the Internal Revenue Service under section 183 recognize, however, that risky activities of this nature may nonetheless be pursued in anticipation of profit, stating:

> The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. *In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit.* Thus it may be found that an investor in a wildcat oil well who incurs very substantial expenditures is in the venture for profit even though the expectation of a profit might be considered unreasonable. In determining whether an activity is engaged in for profit, greater weight is given to *objective facts* than to the taxpayer's mere statement of his intent.

26 C.F.R. § 1.183–2(a) (1990) (emphasis added).

The Tax Court has frequently addressed the bona fides of movie transactions in terms of the "objective facts" that were ascertainable at the time the transactions occurred. In this case, those facts would include the standing and experience of Triad's general partners, the absence of any collusive relationship between Triad or its general partners and Orion, the arm's-length negotiations for the acquisition and distribution of *Promises*, the reputation and experience of its leading lady, director and screenwriter, and a purchase price for *Promises* that approximated its production cost. *See generally Evans v. Commissioner*, 908 F.2d 369, 374 (8th Cir.1990); *Upham v. Commissioner*, 57 T.C.M. (CCH) 508, 512–15 (1989); *Brown v. Commissioner*, 56 T.C.M. (CCH) 638, 649–51 (1988); *Schwartz v. Commissioner*, 54 T.C.M. (CCH) 11, 23–29 (1987); *Vandenhoff v. Commissioner*, 53 T.C.M. (CCH) 271, 277–81 (1987). As to the significance of a purchase price that approximates production cost, see *Evans*, 908 F.2d at 374; *Siegel v. Commissioner*, 78 T.C. 659, 687–88 (1982); *Upham*, 57 T.C.M. at 510, 513; *Vandenhoff*, 53 T.C.M. at 282; *cf. Sheid v. Commissioner*, 50 T.C.M. (CCH) 663, 670 (1985) (purchase as a result of arm's-length bargaining fixes fair market value; appraisal testimony arguably irrelevant).

Interestingly, in *Upham, Brown, Schwartz*, and *Vandenhoff* (1) Glass was a general partner (or, in the case of *Schwartz*, one of two Class A limited partners) of the acquiring partnership; (2) the Tax Court considered and rejected the contention that the acquisition lacked economic substance, was sham, or was not transacted for profit; but (3) the Tax Court concluded that the acquiring partnership did not become the owner of the film in question, although it did acquire a depreciable interest in the gross receipts to be generated by exploitation of the film "acquired" by the partnership. *See also Bailey v. Commissioner*, 912 F.2d 44, 47–48 (2d Cir.1990) (affirming such a Tax Court determination). *Evans* involved a purchase of a film by a Glass partnership from Orion, with many features similar to those presented in the instant case, *see* 908 F.2d at 371, and

reversed as clearly erroneous a Tax Court ruling that (1) the activity in question was not engaged in for profit, *see* section 183(b), and (2) section 6621 penalty interest should be imposed. *See Evans v. Commissioner,* 56 T.C.M. (CCH) 335 (1988), *rev'd,* 908 F.2d 369 (8th Cir.1990).

The primary focus in these and similar Tax Court cases has been upon "the written agreements and the attendant facts and circumstances." *Upham,* 57 T.C.M. at 512 (citing cases); *accord, Brown,* 56 T.C.M. at 649 (citing cases). Here, on the contrary, the Tax Court set aside such considerations, while conceding that they "would indicate a reasonable profit potential before Promises was produced," 55 T.C.M. at 1444. Instead, the court concluded, in reliance upon its own subjective reaction to the film as produced and the testimony of a concurring expert witness, that it was "manifestly impossible" for the film to yield profits to Triad, *id.* at 1443, and that Triad's general partners had to realize this after viewing *Promises* preparatory to its acquisition, *id.* at 1444.

We reject this judicial version of the Siskel and Ebert "thumbs up, thumbs down" approach to film evaluation. The dangers and proclivity for abuse of such hindsight judgments, in so subjective and unpredictable an area of endeavor with a failure rate of approximately ninety percent, are apparent. We are not ruling that no weight can be given to a viewing of a completed film when it is the subject of an acquisition. For example, the Tax Court, as trier of fact, is entitled to include in its consideration any negative assessment that might be warranted as to the technical deficiency of a film, such as its unprofessional production, if such was objectively apparent. But the court is not to reject profit motive because of subjective dislike of a film's style or disapproval of a film's theme. It is not for courts to predict what themes are geared to popular success. A film's depressing theme does not preclude such success, as numerous epics, including "Camille," attest.

Similarly, the Tax Court was entitled to consider, as it did, *see id.* at 1445, the

reconveyance of *Promises* to Orion by Triad in 1987. We do determine, however, that it was error to decide the question of economic substance primarily on the basis of the court's subjective reaction to the finished film, and that primary attention must be given to the considerations traditionally employed by the Tax Court in evaluating movie acquisitions for economic substance and tax consequences. *See Evans,* 908 F.2d at 374.

In view of this determination, the judgment of the Tax Court must be reversed and remanded for reconsideration of Jacobson's 1979 tax liability. As in *Upham, Brown, Schwartz,* and *Vandenhoff,* the court should consider the questions (1) whether there was economic substance to the *Promises* acquisition, and if there was, (2) whether Triad acquired an ownership interest in *Promises,* or some lesser but nonetheless depreciable interest in the gross receipts generated by the exploitation of *Promises. See also Bailey,* 912 F.2d at 47–48.

**B.** *Collateral Matters.*

The Tax Court concluded in its opinion that the Recourse Note was in fact nonrecourse because the repayment of its principal was assured by television receipts already in hand from CBS. As the parties agree, *see supra* note 5, this conclusion was premised upon a factual error. Accordingly, this matter must be reconsidered upon remand, bearing in mind that third-party sources of funds do not necessarily make an obligation nonrecourse for a party who is personally liable to the obligee. *See, e.g., Frank Lyon Co. v. United States,* 435 U.S. 561, 576–77, 98 S.Ct. 1291, 1300, 55 L.Ed.2d 550 (1978); *Gefen v. Commissioner,* 87 T.C. 1471, 1492–93 (1986). *But cf.* section 465(b)(4) and (c)(1) (disallowing loss deduction for taxpayers engaged in "holding, producing, or distributing motion picture films or video tapes" as to "amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements").

The Tax Court also ruled upon deductions taken by Jacobson for his proportionate share of interest and commitment fees paid by Triad with respect to the Marketing Loan and the Additional Financing Loan. These deductions were available to Jacobson despite the ruling that the *Promises* acquisition was a sham transaction. *See* sections 183(b)(1), 163(a).

The Tax Court found that the Additional Finance Loan was a bona fide and fully recourse indebtedness of Triad for which Triad pledged as security the letters of credit and certificates of deposit contributed to Triad by the limited partners evidencing their original capital contributions, *see* 55 T.C.M. at 1440, 1445, and accordingly allowed Jacobson to deduct his proportionate share of interest and commitment fees attributable to that loan. In the absence of a cross-appeal, no issue is presented to us regarding that ruling.

■ The deduction claimed for interest and commitment fees attributable to the Marketing Loan, however, was disallowed on the basis that this loan was not a bona fide indebtedness of Triad. *See id.* at 1445. Even if the motive for a transaction is to avoid taxes, interest incurred therein may still be deductible if it relates to economically substantive indebtedness. *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 95–96 (4th Cir.1985). Here, the Marketing Debt is an actual indebtedness owed to Chemical Bank. The question remains, however, whether Triad's partners are the proper parties to claim the deduction.

■ The Tax Court correctly relied upon *Anderson Dairy, Inc. v. Commissioner*, 39 T.C. 1027, 1044 (1963), for the proposition that a taxpayer may not deduct interest paid or incurred on an obligation of another. *See Borchert v. United States*, 757 F.2d 209, 211 (8th Cir.1985). The court further determined that the Marketing Loan was in reality an obligation of the film's distributor, Orion, rather than a nonrecourse obligation of Triad, as claimed, because the interest and principal of the loan were payable by Orion to Chemical Bank from the gross receipts generated by

*Promises,* and any deficiency was also payable by Orion and treated as a nonrecourse loan to Triad. *See* 55 T.C.M. at 1445. This determination was not clearly erroneous, and is therefore affirmed. In doing so, we reject Jacobson's contention that, because Orion was entitled to recoup interest payments it made on the Marketing Loan from proceeds generated by the exploitation of *Promises* which would otherwise have gone to Triad, Triad is entitled to deduct those payments. *See Pounds v. United States,* 372 F.2d 342, 352 (5th Cir.1967).

Finally, the Tax Court determined that penalty interest should be imposed pursuant to section 6621(d) because the acquisition of *Promises* was "sham" within the meaning of that section. *See* 55 T.C.M. at 1445. In view of our reversal of the Tax Court's basic determination that the transaction lacked economic substance, the penalty interest ruling must also be reversed.

### Conclusion

Except as it relates to the deductibility of interest and commitment fees paid with respect to the Marketing Loan and the Additional Financing Loan, the decision of the Tax Court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.