JOHN S. EVANS AND SUE A. EVANS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Evans v. Commissioner
Docket No. 9072-86.
United States Tax Court
T.C. Memo 1988-468; 1988 Tax Ct. Memo LEXIS 493; 56 T.C.M. (CCH) 335; T.C.M. (RIA) 88468; September 27, 1988. Jerome R. Rosenberg, for the petitioners. Ellen J. Mechlin and Elizabeth P. Flores, for the respondent. *495 TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1977
$ 3,966
1978
4,626
1979
7,986
1980
8,428
By amendment to answer, respondent determined that, under section 6621(c), [1] the deficiency was substantial underpayment attributable to a tax-motivated transaction so that petitioners are liable for interest at 120 percent of the statutory rate. After concessions, we must determine whether Heartbeat Associates, a limited partnership, was entitled to various deductions and an investment tax credit with respect to its purchase and distribution of the motion picture "Heartbeat" and, in turn, whether petitioners were entitled to their distributive shares of such deductions and credit. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the supplemental stipulations *496 of facts, together with the attached exhibits, are incorporated herein by reference. Petitioners resided in Lee's Summit, Missouri, at the time that they filed their petition. They timely filed joint Federal income tax returns for the years 1977 through 1980 with the Internal Revenue Service Center, Kansas City, Missouri. Heartbeat Associates (the Partnership) is a New York limited partnership organized on November 29, 1979. It has two general partners, Daniel Glass (Glass) and Seymour Malamed (Malamed). It was formed for the purpose of owning and exploiting the motion picture "Heartbeat" ("Heartbeat" or the movie), which was to be distributed by Orion Pictures Company (Orion)[2] through Warner Brothers, Inc. (Warner Brothers). Glass has been an attorney engaged in the practice of law for approximately 40 years, beginning at the predecessor of Phillips, Nizer, Benjamin & Krim, a firm substantially involved in the legal aspects of the motion picture and television industry. He was subsequently *497 employed as general counsel of the television subsidiary of Columbia Pictures. He is now a partner in the law firm of Migdal, Tenney, Glass and Pollack. Malamed has worked in the entertainment field for approximately 30 years, including approximately 20 years with Columbia Pictures in various executive-level administrative and financial capacities. He currently is chairman of The Vista Organization, Ltd., a publicly-held motion picture and television film production and distribution company. "Heartbeat" deals with the life of "beat generation" novelist Jack Kerouac and his relationship with Neal Cassady and with Neal Cassady's wife Carolyn Cassady, including the menage-a-trois in which they lived for a time. It is based on Carolyn Cassady's memoirs. It was written and directed by John Byrum, and produced by Edward Pressman, with Michael Shamberg and Alan Greisman. It starred Sissy Spacek, who had been featured in "Carrie," Nick Nolte, whose credits included "North Dallas Forty," "Who'll Stop the Rain," "The Deep" and the television miniseries "Rich Man, Poor Man" and John Heard, who had appeared in "First Love" and "On the Yard." On September 7, 1979, there was a sneak preview *498 showing of "Heartbeat" in Denver, Colorado. The movie was released on January 18, 1980, in Dallas, Houston and Los Angeles. [3] The movie has been shown on pay television and has been released on videocassettes. It has never had a domestic non-pay television sale. Gross receipts of the movie, as of June 30, 1987, totaled $ 2,136,428. On December 28, 1979, as of December 20, 1979, the Partnership purchased [4] "Heartbeat" from Orion for a total purchase price of $ 4,420,000. The general partners did not review Orion's projections for the movie, nor did they examine the results of the sneak preview or any bidding letters that Orion may have received from theaters. [5] The purchase price did not exceed the movie's production costs, including Orion's interest on production loans up to the date of closing the sale to the Partnership, and a 15 percent allowance for Orion's overhead. *499 Of the purchase price, $ 300,000 was paid in cash; the balance was evidenced by two promissory notes. The first note, for $ 2,000,000, was recourse as to principal and nonrecourse as to interest. [6] The other, for $ 2,120,000, was nonrecourse as to both principal and interest. Both notes were nonnegotiable. Both bore interest at a rate of 6 percent, and both were due January 15, 1987. The notes, and the interest due thereon, were secured by a security interest in the Partnership's right, title and interest in the movie. Pursuant to the purchase agreement with Orion, the Partnership acquired "Heartbeat," subject to certain contingent amounts payable out of, and calculated based on, the gross receipts of the movie. Excepted from the sale were Orion's rights in the underlying literary, dramatic and musical material on which "Heartbeat" was based, and the copyrights thereto, television series and special rights, remake or sequel rights, ancillary rights (such as theatrical stage rights), the right to enter into agreements with respect *500 to the underlying literary and musical material and option rights with respect to persons who had rendered services while producing "Heartbeat." To market "Heartbeat," the Partnership entered into a distribution agreement with Orion that was also dated as of December 20, 1979. In the distribution agreement, the Partnership granted Orion all advertising, distribution, exhibition and exploitation rights in the movie in perpetuity. Orion agreed to consult the Partnership regarding certain matters, in particular the initial advertising campaign, release date and marketing strategy, but Orion's decisions as to these matters were to be final. Under the distribution agreement, the Partnership was required to advance $ 450,000 to Orion for advertising "Heartbeat." Additional advertising expenses were to be advanced by Orion. Both categories of expenses were to be recouped out of the film receipts. In addition, the Partnership was required to pay Orion $ 800,000 for services rendered before release of the movie (the marketing strategy fee). This amount was separate from and in addition to the distribution fees to be paid Orion under the agreement. Both of these amounts were paid. *501 In order to pay the above two amounts and the $ 300,000 downpayment, as well as to meet other expenses, the Partnership obtained three loans from Chemical Bank of New York (Chemical Bank), as follows: Initial
Maximum
Loan
Principal
Principal
Due Date
Nonrecourse marketing
$ 550,000
$ 550,000
1-15-81
loan
Recourse marketing
237,500
400,000
1-15-81
loan
Additional financing
300,000
540,000
4-15-80
loan (recourse)
The principal of the nonrecourse marketing loan was to be repaid from the first $ 550,000 of adjusted gross receipts; the interest was to be paid from the nondistributable net receipts. See page 10, infra. Interest on the recourse marketing loan was also to be paid from nondistributable net receipts. If nondistributable net receipts were not sufficient to make such payments, Orion was to make them, and treat the advance as a nonrecourse loan to be repaid from subsequent nondistributable net receipts. As security for the payment of the principal and interest of the additional financing loan and the principal of the recourse marketing loan, the Partnership gave Chemical Bank the right to receive payment under *502 certain letters of credit signed by the limited partners. In addition, the Partnership gave Chemical Bank a security interest in its tangible and intangible property. During 1980, interest was paid on the notes as follows: Nonrecourse marketing loan (paid by Orion)
$ 72,496.88
Additional financing loan (paid by Orion)
18,894.44
Recourse marketing loan (paid by Orion)
28,811.12
Additional financing loan
(paid by the Partnership)
2,563.07
Recourse marketing loan
(paid by the Partnership)
[7] 20,701.73
The additional financing loan was paid off by the Partnership on April 28, 1980. [8] The nonrecourse marketing loan was paid off on January 15, 1981, by Orion out of the adjusted gross receipts earned from exploitation of the movie. [9]
*503 Under the distribution agreement, Orion agreed to pay the Partnership a portion of the proceeds from the exploitation of the movie. The portion of the proceeds to accrue to the Partnership was set out as a series of levels. On the first level, Orion was to deduct its distribution fee [10] from gross receipts. [11]
The amount remaining after deducting Orion's fees was termed adjusted gross receipts. Part of the adjusted gross receipts were to be distributed as follows. First, a portion of adjusted gross receipts equal to 12.36 percent of the gross receipts was to be used to pay accrued interest, first *504 on the recourse and then on the nonrecourse purchase notes, up to $ 1,730,400. Next, any excess of adjusted gross receipts equal to 12.36 percent of gross receipts over such adjusted gross receipts applied to accrued interest was to be used to reduce the principal balance of the recourse note when that note became due. Second, $ 450,000 of the adjusted gross receipts was to be used to pay the advance by the Partnership for advertising expenses. Third, $ 900,000 was to be used to reduce the balance of the recourse note. [12] Finally, Orion's distribution cost in excess of $ 1,250,000 were to be repaid. [13]
The Partnership's share of receipts was equal to the adjusted gross *505 receipts less payments out of adjusted gross receipts; third-party participations were to be paid from this. The Partnership authorized Orion to make those payments. [14]
Net receipts were the Partnership's share of receipts less third-party participations. Nondistributable net receipts were 73.8 percent of net receipts. After making the interest payments required by the Chemical Bank notes, the balance of the nondistributable net receipts was to be used to pay the interest on the purchase notes, $ 1.1 million of the principal of the recourse note and the unpaid principal of the nonrecourse note. The balance of the net receipts was to be distributed to the partnership. Such distributions were to begin in 1981. Under the distribution agreement, the Partnership was required to deliver to Orion a laboratory access letter. Under this letter, Orion had *506 exclusive access to the material that was in the laboratory, including, among other things, the original film negative and sound negative. Orion, however, acknowledged to the laboratory that the Partnership was the owner of the material relating to "Heartbeat" that was on deposit. The Partnership appointed Orion its attorney-in-fact to protect the Partnership's rights in the copyright to "Heartbeat." Orion agreed that it was holding the Partnership's copyright interest in trust where the copyright notice was in Orion's name. The copyright notice on the movie was to read "Copyright * * * Orion Pictures Company' All Rights Reserved.'" [15]
Twelve full-unit limited partnership interests in Heartbeat Associates were offered. A full-unit investment required a cash investment of $ 142,500, to be paid as follows: Date
Amount
Upon Subscription
$ 25,000
April 15, 1980
67,500
January 15, 1981
50,000
In addition, each limited partner was required to assume personal liability for his ratable share *507 of the recourse purchase note to Orion and the recourse marketing loan from Chemical Bank. Before investing in the Partnership, potential limited partners received a copy of the private offering memorandum. The offering memorandum indicated that the limited partners would begin to recoup their investment when gross receipts equaled $ 4 million and that they would fully recoup their investment, i.e., break even, when gross receipts equaled $ 28.5 million, a level of gross receipts that would be achieved by only the top 15 movies released in 1979. [16] The offering memorandum warned of the risks of investment, including the general risks of the movie industry [17] and the potential tax risks. In addition, the offering memorandum included a lengthy tax opinion. Prospective limited partners also were given projections *508 prepared by the accounting firm of Laventhol and Horwath. These projections were based on estimates and assumptions supplied by the general partners. They showed the following cumulative per-unit cash distributions for gross receipts at various levels for an investment in one unit of the Partnership: Gross Receipts
$ 8 million
$ 18 million
$ 30 million
Distributions
$  43,462 $ 104,737 $ 147,962
Cash investment
142,500 142,500 142,500
Net cash
(99,038)
(37,763)
5,462
They also showed the following results on an after-tax basis (cumulative for the years 1979 through 1987): $ 8 million
$ 18 million
$ 30 million
Tax savings a
$ 60,636 $  23,872 ($  2,066)
Net cash
(99,038)
(37,763 5,462 After-tax benefit b
(38,402)
(13,891)
3,396 Total benefit if
funds invested c
(654)
35,001 59,124 *509 Mr. Evans became a limited partner in the Partnership on December 28, 1979. He purchased a one-quarter unit interest, giving him a 2.49-percent interest in the Partnership's profits and losses. He made a cash contribution of $ 6,250 and executed two promissory notes, one due April 15, 1980, in the face amount of $ 16,875, and the other due January 15, 1981, in the face amount of $ 12,500. Both promissory notes were secured by irrevocable letters of credit in favor of Chemical Bank. He assumed the primary obligation to make payment of $ 39,583.25 (his ratable share) of the principal amount of the recourse purchase note. In addition, he assumed liability for $ 11,875 (again, his ratable share) of the principal amount of the recourse marketing loan from Chemical Bank. For Federal income tax purposes, the Partnership used the cash receipts and disbursements method of accounting. On its 1979 Partnership income tax return, the Partnership elected the double-declining balance method of depreciation for "Heartbeat," and claimed a 4-year useful life. For 1979, it claimed no depreciation deduction but did deduct the $ 450,000 paid to Orion as an advance of advertising expenses and *510 the $ 800,000 paid as the marketing strategy fee. On its 1980 Partnership income tax return, the Partnership reported income of $ 172,588.19. [18] It claimed the following deductions: Item
Amount
Interest expense
$   194,672
Depreciation expense
2,210,000
Other expense
Printing
$  1,541
Messenger
1,169
Professional fees
63,154
Bank service charges
53
Miscellaneous office
4,617
70,534
Guaranteed payments
85,000
Total
$ 2,560,206
The interest expense claimed by the Partnership included $ 120,202.44 paid by Orion to Chemical Bank and $ 51,205.00 applied by Orion from adjusted gross receipts to the interest due on the recourse purchase note (that is, the first two items in n.18, supra), and $ 23,264.80 paid by the Partnership to Chemical Bank (that is, the last two items of interest noted on page 8, supra). The Partnership also claimed, on the 1980 return, a qualified *511 investment for purposes of an investment tax credit of $ 2.3 million, which was equal to the cash portion of the purchase price plus the recourse purchase note. [19]
Shortly after the release of "Heartbeat," the joint venture between Orion and Warner Brothers under which the movie was distributed ended. As a result, distribution of "Heartbeat" was left in the hands of Warner Brothers. A dispute arose between the Partnership and Warner Brothers with respect to whether Warner Brothers was complying with the requirements of the distribution agreement as to permissible distribution expenses. Ralph Peterson (Peterson), chief financial officer of Warner Brothers, was responsible for resolving, if possible, the dispute. To this end, he, and to a greater extent his legal staff, engaged in a series of discussions with the general partners. Peterson felt that the Partnership's claims could lead to a legal proceeding against Warner Brothers in which Warner Brothers would incur substantial legal fees and in which Warner Brothers could be liable to the Partnership for a substantial sum on its claims. *512 In addition, Peterson believed that collecting the balance due on the recourse purchase note would entail a large expense. He also felt that "Heartbeat" could realize between $ 500,000 and $ 1 million in untapped markets. He therefore agreed to repurchase the movie for $ 75,000 cash and an amount equal to the outstanding principal and interest on the two purchase notes, which was to be paid by crediting that amount in full satisfaction of the notes. The agreement was dated September 4, 1987, and, subject to the approval of the Partnership's limited partners, was to take effect on January 15, 1988, which was after the trial herein. It extended the due dates of the notes to that date. OPINION Respondent has mounted a broad attack in the instant case with the result that the parties have directed their arguments to several issues. Initially, we will focus our attention on what we consider to be the critical issue, namely whether the Partnership purchased "Heartbeat" with the requisite profit objective. [20]The burden of proof as to the underlying deficiencies is on petitioners. [21]Rule *513 142(a); Taube v. Commissioner,88 T.C. 464, 480 (1987). We hold that they have failed to carry that burden. Section 162(a) allows a deduction for the ordinary and necessary expenses of a trade or business, and section 212 allows a deduction for such expenses paid or incurred for the production of income. Section 167(a) allows depreciation deductions for property used in a trade or business or held for the production of income, and *514 section 38 allows an investment tax credit for investments in depreciable tangible personal property. See section 48(a)(1). The accepted standard in determining whether an activity is a trade or business or carried on for the production of income requires a showing that the activity was entered into with an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although the expectation need not be reasonable, it must be shown that a bona fide objective of making a profit did exist. Taube v. Commissioner, supra at 478-479. Profit in this context, as a threshold matter, [22] means economic profit, independent of tax savings. Drobny v. Commissioner,86 T.C. 1326, 1341 (1986). The determination is made at the partnership level, Taube v. Commissioner,88 T.C. at 478, and the focus is on the general partners and the beginning of the transaction, that is, 1979. See 88 T.C. at 480. The objective is a question of fact to be determined from all the facts and circumstances. Dreicer v. Commissioner, *515 78 JT.C. at 645. The regulations promulgated under section 183 list nine factors that should be taken into account in determining whether an activity is engaged in for profit. Section 1.183-2(b)(1)-(9), Income Tax Regs. This is intended, however, as only a partial list. Section 1.183-2(b), Income Tax Regs. We see no need to discuss each factor; rather, we will deal with the entire record in the context of the parties' arguments. See Taube v. Commissioner,88 T.C. at 479-481. Petitioners argue that the experience of the general partners and the characteristics of "Heartbeat" are sufficient, in light of the speculative nature of the motion picture industry, to support their profit objective. Respondent contends otherwise. [23] We agree with respondent. *516 We are satisfied that both general partners were experienced in the entertainment field, in evaluating motion pictures and in transactions of this nature. Thus, we think that they were fully capable of evaluating the movie and its prospects. In addition, at least before the movie was made, the characteristics of "Heartbeat" are such as to indicate that the movie could be profitable. The performers in the movie, while not having reached the same level of fame that they have since achieved, were already accepted performers with substantial credits. Orion, while not an established company, was managed by individuals with experience in the motion picture industry. In our judgment, however, these positive factors are outweighed by the negative factors revealed in the record. First, while we agree that the movie's characteristics are good on paper, the movie had been completed when the Partnership purchase it so that the general partners were afforded the opportunity to evaluate more than its paper characteristics. They apparently failed to do this, looking instead to the movie's cast and cost, factors that are largely determined before a motion picture is completed. We recognize *517 that the motion picture industry is highly speculative, but the fact of the matter is that the Partnership was in a better position to evaluate the movie when it purchased it than it would have been before the movie was made. The fact that it did not take advantage of the situation undermines petitioners' assertion of reliance on the business judgment of the general partners as to the viability of the project. Furthermore, to the extent that there was evidence of the movie's potential success, other than the cast and production costs, available at the time the transaction was entered into, the general partners did not utilize or consider it. In particular, they did not review the results of the sneak preview showing of the movie. While we recognize that the movie was subject to further editing because of the results of the sneak preview, we think that those results would have been a great help in determining the eventual success of the movie. Moreover, the general partners did not examine Orion's pre-release projections for the movie, which would have been helpful in determining what income Orion, which was most familiar with the movie, expected it to produce. We are not impressed *518 with petitioner's reliance on the fact that the purchase price of the film did not exceed its production costs. The equivalence of production costs and purchase price is not determinative; it is only one of many factors to be taken into account. Finally, we do not believe that the general partners could have had a bona fide belief that this movie would realize gross receipts of $ 28.5 million, which would be necessary for it to realize any economic profit whatsoever. See p. 12, supra. That level of gross receipts would put it into the top 15 movies released during 1979, a result that we do not consider possible for a serious film that was released at a non-peak time (that is, January rather than Christmas or summer). We find this to be particularly true where, as here, the subject matter of the film -- especially the menage-a-trois in which the characters of the film were involved -- largely eliminates any possibility of sale to network television. [24]
We are reinforced in our conclusion *519 as to the potential gross receipts of the movie by the expert testimony presented by both parties. Each of the five experts valued the movie in a different market, with only one giving an evaluation of the entire movie. [25] Each used an income-forecast type evaluation, considering the gross income to be derived and subtracting the expenses of distribution. Taking those figures from each expert that are most favorable to petitioners, the highest gross income projected in all markets was $ 12.4 million, far less than the $ 28.5 million required to earn even a minimal economic profit. Even if we accept petitioners' forecast of $ 30 million of gross receipts, it is apparent that the economic profit would be rediculously small -- $ 5,462 at the end of 8 years on an investment of $ 142,500 (see p. 12, supra) or 3.8 percent (.475 percent per annum). [26]
*520 Based on the foregoing analyses and on all the facts and circumstances in the record, even taking into account the speculative nature of the motion picture industry, we hold that the Partnership (and therefore petitioners) did not engage in the activity involving the film "Heartbeat" with the requisite profit objective. We turn now to the deductibility of the interest payments made and alledgedly on behalf of the Partnership. In general, a deduction is allowed for all interest on indebtedness paid within a taxable year. Section 163(a). For purposes of that section, an indebtedness is an existing, unconditional and legally enforceable obligation for the payment of money. See Dirkin v. Commissioner,87 T.C. 1329, 1399 (1987), on appeal (7th Cir., Feb 1, 1988); Kovtun v. Commissioner,54 T.C. 331, 338 (1970), affd. 448 F.2d 1268 (9th Cir. 1971). Interest on indebtedness is "compensation for the use of forebearance of money." Deputy v. duPont,308 U.S. 488, 498 (1940). The fact that the interest is incurred in carrying on an *521 activity that is not engaged in for profit does not affect this deduction, see section 183(b)(1), provided that the indebtedness is genuine debt. See Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 96 (4th Cir. 1985), revg. in part 81 T.C. 184 (1983); Rose v. Commissioner,88 T.C. 386, 423 (1987), on appeal (6th Cir., Dec. 14, 1987). Respondent asserts that none of the debt incurred by the Partnership was genuine. We are satisfied, however, that the two recourse loans made by Chemical Bank (one of the marketing loans and the additional financing loan, see p. 7, supra) were in fact genuine debt. Both were adequately secured, either by assumption agreements or letters of credit, and the loan that was due in 1980 was paid. The fact that some of the interest payments that were made on these loans were made by Orion does not change our conclusion, given that the Partnership included the amounts paid by Orion in its income. [27]
*522 Respondent does argue that the nonrecourse marketing loan was either a contingent liability or in substance an obligation of Orion. We disagree. We do not believe that the amount of this loan, $ 550,000, is out of line with the potential gross receipts to be derived from the movies, so repayment of the loan should be considered not speculative or contingent. See Estate of Baron v. Commissioner,83 T.C. 542, 549-550 (1984), affd. 798 F.2d 65 (2d Cir. 1986). In this regard, we note that the loan was an actual transfer of cash by a third party, rather than a note taken by a seller of an asset as part payment of the putative purchase price, and that the note was payable out of the first receipts received from exploitation of the movie. Nor do we think that Orion's obligation to lend the amount of the interest payments to the Partnership makes this loan Orion's obligation, especially since Orion did not have a similar obligation to lend the principal amount of the loan should the adjusted gross receipts derived from the movie be insufficient to repay the principal. As with the recourse marketing loan, Orion did in fact make the interest payments, but *523 also as with the recourse marketing loan the Partnership included the payments made on its behalf in its income. [28]
Finally, respondent argues that the $ 2,000,000 recourse purchase note of the Partnership to Orion was not genuine indebtedness because the parties in 1979 did not expect it to be repaid. We disagree. The debt was recourse on its face, and the limited partners were required to, and did, assume their ratable share of the debt as part of their investment in the Partnership. We think it is clear that the parties believed, in 1979, that either the Partnership or the limited partners would be required to repay this debt, [29] and that the subsequent forgiveness and sale of the movie to Warner Brothers was the result of business contingencies that were not foreseen in 1979. [30] See pages 15-16, supra.
*524 We turn to respondent's assertion in his amended answer that petitioners are liable under section 6621(c) for interest on the underpayment at 120 percent of the statutory rate. That section provides that additional interest will be due if a "substantial underpayment" (that is, an underpayment of more than $ 1,000) is attributable to a "tax motivated transaction." Certain transactions are deemed to be "tax motivated" by section 6621(c)(3). In addition, the Secretary of the Treasury is given authority to promulgate regulations specifying additional transactions that are to be deemed tax motivated. Section 6621(c)(3)(B). By these regulations, any losses disallowed under section 183 because an activity was not engaged in for profit are attributable to a tax motivated transaction. Section 301.6621-2T, Q-4 & A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 49,394 (Dec. 28, 1984). Here, we have found that petitioners entered into this transaction without a profit objective independent of the tax benefits. Therefore, we find that this was a tax motivated transaction, and respondent *525 is entitled to additional interest on the interest accruing after December 31, 1984. See Patin v. Commissioner,88 T.C. 1086, 1129 (1987), affd. in an unpublished opinion sub nom. Hatheway v. Commissioner,    F.2d    (4th Cir., Aug. 23, 1988). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. At that time, Orion was a newly formed entity that had distributed only 6 motion pictures. The executive officers of Orion, however, had extensive experience in the industry. ↩
3. In general, the best times to release a new motion picture are the Christmas holidays and summer. ↩
4. use of such terms as "purchase," "sale," "own," "interest," "principal" and "price" should not be construed as carrying any conclusion as to the legal effect of the documents or transactions involved herein. ↩
5. The Partnership also did not have an appraisal made of the movie. ↩
6. Each general partner's personal liability on this note was limited to 5 percent of the unpaid balance of the principal portion at any time. ↩
7. Apparently, Orion made payments of interest on the additional financing loan that were, under the various agreements, the Partnership's responsibility, and the Partnership made the corresponding payments on the recourse marketing loan, which were Orion's responsibility, subject to reimbursement in accordance with those agreements. ↩
8. On April 28, 1980, the principal balance of the loan was $ 272,187.50. During the term of the loan, it had been as high as $ 450,000. ↩
9. The amount of Orion's payment was included in the Partnership's gross income in 1981. ↩
10. Orion's distribution fee ranged from 15 percent to 45 percent of gross receipts, depending on the market from which those receipts were derived. Before the movie grossed $ 14 million (a level termed "breakeven"), however, those fees were to be reduced by 12.36 percentage points so that the fees ranged from 2.64 percent to 32.64 percent. After breakeven, certain of the fees were to be increased, so that the fees would then range from 31.875 percent to 61.875 percent. ↩
11. Gross receipts were essentially all the income derived by Orion from exploitation of "Heartbeat." ↩
12. Originally $ 1 million was to be used for this purpose, but this amount was reduced to $ 900,000. Apparently, the $ 450,000 to be paid to cover advanced advertising expenses should have been increased by that $ 100,000, to $ 550,000, in order to repay the nonrecourse marketing loan from Chemical Bank. Orion did pay $ 550,000 of adjusted gross receipts to Chemical Bank on that note. ↩
13. Adjusted gross receipts derived from television sales were to be used to decrease the balance of the recourse note. ↩
14. Third-party participations, in various amounts calculated in various manners, were payable to Chai Productions, Inc. (for Nick Nolte), Sissy Spacek, John Heard, John Byrum, North Spur Productions (for Jack Nitzche, the composer), Jack Fisk, Laszlo Kovacs Productions, Inc., Carolyn Cassady and Pressman-Further Productions. ↩
15. Similarly, in advertising and publicity, Orion was to characterize the movie as "An Orion Pictures Release Through Warner Bros., a Warner Communications Company." ↩
16. There is nothing in the record to indicate that this was not the usual annual level of gross receipts of highly successful movies. ↩
17. In several places, the offering memorandum indicated that there was a "high risk" that the movie would not yield sufficient cash to enable the limited partners to recoup their investment, much less obtain a return thereon. ↩
a. Assumes a marginal tax rate of 60 percent. ↩
b. Tax savings plus net cash. ↩
c. Assumes that the net funds generated by the Partnership to the limited partner (that is, the cash distributions plus tax savings (or less tax cost) less cash invested) are invested at a 6-percent after-tax rate. ↩
18. That income consisted of the following items: ↩
Interest paid by Orion on the loans
from Chemical (see p. 8 supra)
$ 120,202.44
Interest on recourse purchase note
51,205.00
Other
1,180.75
$ 172,588.19
19. In the purchase agreement, Orion disclaimed any right to the investment tax credit. ↩
20. The other issues are (1) whether the Partnership acquired the benefits and burdens of ownership of "Heartbeat" under the purchase agreement and the distribution agreement; (2) whether the amount at risk includes the recourse purchase note; (3) whether the nonrecourse and recourse purchase notes are includable in the Partnership's basis in the movie; (4) whether the Partnership is otherwise entitled to the claimed investment tax credit; and (5) whether the various expense deductions were proper. ↩
21. The burden of proof with respect to the section 6621(c) issue, which was raised by amendment to answer, is on respondent. Rule 142(a)↩. 22. See Estate of Baron v. Commissioner,83 T.C. 542, 557-558 (1984), affd. 798 F.2d 65↩ (2d Cir. 1986). 23. Respondent also argues that the transaction was a generic tax shelter, as that term is defined in Rose v. Commissioner,88 T.C. 386 (1987), on appeal (6th Cir., Dec. 14, 1987), and that the transaction is lacking in economic substance. Because the arguments he makes in that context are largely the same as those he makes in the context of his analysis of profit objective, we will deal with them only in the latter context. We should note, however, that our outcome would be the same were we to apply the objective analysis of Rose.↩
24. We note that while the brief nudity in the movie could be edited without harming the plot, the same cannot be said for references to the menage-a-trois and scenes concerning it. ↩
25. Petitioners called three expert witnesses: Max Youngstein, Maurice Silverstein and Marvin Grieve. Those experts testified that the following amounts of gross income would be derived in the various markets: Youngstein
Silverstein
Grieve
Domestic
Theatrical
$ 5,000
--
--
Foreign
Theatrical
2,000,000
$ 3,000,000
--
Network
Television
2,000,000
--
$ 2,000,000
Others
2,000,000
--
2,300,000
Other markets include domestic television syndication, pay television, foreign television and ancillary markets such as home video. Silverstein estimated gross receipts in foreign television and video markets of $ 500,000, a figure that is not directly comparable to the figures in the chart above. Respondent called two experts. William Madden testified that gross receipts from domestic theaters would total $ 600,000. Robert Newgard testified that there would be no network television sale and that gross receipts in other markets would total $ 2.4 million. ↩
26. We note that if the funds generated by the investment, including the tax benefits, are invested, they produce an overall financial breakeven which, disregarding the tax benefits, is not achieved until gross receipts reach $ 28.5 million. ↩
27. We note that under the distribution agreement, these payments were nonrecourse loans from Orion to the Partnership. apparently the Partnership did not consider them to be genuine loans by Orion as they included them in income. See also n. 18, supra.↩
28. Similarly, Orion made the actual payment of the principal of the note, and the Partnership included that amount in its 1981 income. ↩
29. We note that the general partners were careful to limit their potential liability, a fact that we think tends to show that they expected the debt to be enforced. ↩
30. We recognize that, in Jacobson v. Commissioner,T.C. Memo. 1988-341, we reached a different result in respect of the interest on the nonrecourse marketing loan and on the recourse purchase note involved therein. We note, however, that Jacobson dealt with a different movie and different amounts, terms and conditions of the transactions relating thereto. Moreover, in respect of the bona fides of the 1987 settlement agreement with Warner Brothers, we heard the testimony of Peterson, see pp. 15-16, supra, whom we found to be a highly credible witness; neither Peterson nor a comparable witness from Warner Brothers testified in Jacobson.Finally, in Jacobson, there was a sale of the television rights to CBS by Orion prior to the time the purchase agreement was entered into by the parties in that case, the receipts from which effectively assured the payment of the recourse purchase note; no such source of receipts was available in the instant situation. Thus, there were differing facts and differing conclusions which could be drawn therefrom which caused us to view the totality of the situation in Jacobson from a different perspective from that which we find appropriate herein and which account for the differing results. Cf. Estate of Bette v. Commissioner,T. C. Memo. 1977-404↩.