**John S. EVANS and Sue A. Evans, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 89–2008.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1990.

Decided July 13, 1990.

Walter J. Rockler, Washington, D.C., for appellants.

Teresa McLaughlin, Washington, D.C., for appellee.

Before LAY, Chief Judge, BEAM, Circuit Judge and HANSON,* Senior District Judge.

BEAM, Circuit Judge.

John S. Evans and Sue A. Evans [1] appeal the tax court's determination that John Evans' partnership, Heartbeat Associates, was not engaged in activities for the purpose of making a profit, a violation of 26 U.S.C. § 183 (1982 & Supp. IV 1986).[2] The taxpayers also appeal the tax court's imposition of a penalty interest rate for a "tax motivated transaction" pursuant to 26 U.S.C. § 6621(c) (1982 & Supp. IV 1986). We reverse.

## I. BACKGROUND

John and Sue Evans filed joint federal income tax returns for the years 1977 through 1980. John Evans became a limited partner in Heartbeat Associates (the partnership) on December 28, 1979. Heart-

beat Associates is a New York limited partnership which was formed on November 29, 1979. The two general partners, Daniel Glass and Seymour Malamed, organized the partnership for the purpose of owning and exploiting the motion picture *Heartbeat*. The movie starred Sissy Spacek, Nick Nolte, and John Heard. Spacek starred in the 1976 motion picture *Carrie*, for which she was nominated for the Best Actress Academy Award. *See* Appellants' App. at 40. In 1980, Spacek won the Best Actress Academy Award for her role in *Coal Miner's Daughter*. *Id.* Spacek also received Best Actress nominations for *Missing, The River*, and *Crimes of the Heart*. *See* Appellants' App. at 445, 453. Nolte starred in the motion picture *North Dallas Forty*, and in the television miniseries *Rich Man, Poor Man*. *See id.* at 444. Heard appeared in the films *First Love* and *On the Yard*. *See id.* at 446.

*Heartbeat* was based on Carolyn Cassady's memoirs, and focused on the life of "beat generation" novelist Jack Kerouac. The film depicted the relationship between Kerouac, Neal Cassady and Carolyn Cassady, including their menage a trois. John Byrum wrote and directed *Heartbeat*, and Edward Pressman, Michael Shamberg, and Alan Greisman produced the motion picture.

The two general partners of Heartbeat Associates, Glass and Malamed, were experienced in the entertainment field at the time that they formed Heartbeat Associates. Glass is an attorney who has practiced law for approximately forty years, including many years in the motion picture and entertainment industry. At one time during his career, Glass was employed as general counsel of the television subsidiary of Columbia Pictures. Glass organized limited partnerships to acquire the rights to various motion pictures, including *Hooper*,

---

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern/Southern Districts of Iowa, sitting by designation.

1. Sue A. Evans is a party to this action solely because she filed a joint income tax return during the years 1977 through 1980, with her husband, John S. Evans.

2. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

*On Golden Pond, Semi–Tough, Carrie, The Killer Elite,* and *Breakheart Pass. See id.* at 161, 577–79. Malamed has been involved in the entertainment industry for approximately thirty years. He was employed by Columbia Pictures in various executive positions. Currently, Malamed is the chairman of The Vista Organization, Ltd., a publicly-held motion picture and television film production and distribution company. Malamed also organized limited partnerships to acquire motion pictures, including *California Suite, Midnight Express, Body Heat,* and *St. Ives. See id.* at 162, 529, 539.

In December of 1979, the partnership bought *Heartbeat* from Orion Pictures Company for $4,420,000. The purchase price did not exceed the movie's production costs, including both the interest paid on production loans up to the closing date of the sale, and a fifteen percent allowance for Orion's overhead. The partnership paid $300,000 in cash and executed two promissory notes for the balance of the purchase price. Pursuant to the purchase agreement, the partnership was required to pay Orion specific contingent amounts based on the movie's gross receipts.

The partnership also executed a distribution agreement which granted Orion all advertising, distribution, exhibition, and exploitation rights in the motion picture in perpetuity. Orion was to distribute *Heartbeat* through Warner Brothers, Inc. The partnership was required to pay $450,000 for advertising and $800,000 for a marketing strategy fee. These fees were separate from the distribution fees, and the partnership paid the required amounts by obtaining three loans from the Chemical Bank of New York.

The partnership offered twelve full-unit limited partnership interests. Each limited partner invested a total of $142,500, which was payable in installments of $25,000 upon subscription, $67,500 on April 15, 1980, and $50,000 on January 15, 1981. Also, each limited partner was required to assume personal liability for his or her ratable share of the recourse purchase note to Orion and the recourse marketing loan from Chemical Bank.

On December 28, 1979, John Evans became a limited partner in the partnership by purchasing a one-quarter unit interest. Evans paid $6,250, and executed two notes in the amounts of $16,875 and $12,500. Evans also assumed personal liability for $51,458 as his share of the recourse obligations to Orion and Chemical Bank.

In its 1979 income tax return, Heartbeat Associates claimed deductions of $1,250,000 for advertising costs and distribution fees. *See id.* at 393. In its 1980 income tax return, Heartbeat Associates reported as income the amounts of gross receipts applied to the Chemical Bank and Orion payments. It reported depreciation expense of $2,210,000, interest expense of approximately $194,000, and professional fee expense of $63,154. Heartbeat Associates claimed a qualified investment, for investment tax credit purposes, equal to the sum of the $300,000 in cash and the $2,000,000 recourse note paid to Orion for the purchase of the film.

On their 1979 and 1980 joint returns, John and Sue reported as losses John's distributive share of Heartbeat Associates' losses for those years, and they claimed an investment tax credit for 1980 attributable to his interest in the partnership.[3] *See id.* at 34–103. On January 28, 1986, the Commissioner of Internal Revenue sent a statutory notice of deficiency to the taxpayers, assessing deficiencies in the amounts of $3,966, $4,626, $7,986, and $8,428 for the years 1977, 1978, 1979, and 1980, respectively. On April 7, 1986, the taxpayers filed a petition with the United States Tax Court seeking a redetermination of the deficiencies. *See id.* at 5. Before trial, the Commissioner filed an amendment to his answer seeking a proposed penalty interest against the taxpayers.

The case was tried on December 8, 1987. As indicated, the tax court determined that Heartbeat Associates was not engaged in an activity for profit. The tax court also

---

3.  The Internal Revenue Service found deficiencies for the years 1977 and 1978 because of the disallowance of a carryback of the 1980 losses and investment tax credit.

imposed a penalty interest rate against the taxpayers for the tax-motivated transaction.

## II. DISCUSSION

Section 183(a)[4] of the Internal Revenue Code provides that if an individual does not engage in an activity for profit, the deductions arising out of such activity will not be allowed, except as provided in section 183(b). To determine whether an activity is "not engaged in for profit," section 183(c)[5] must be examined in conjunction with section 162,[6] which allows deductions for trade or business expenses, and section 212,[7] which specifies allowable deductions for expenses paid or incurred for the production of income. Also, section 167(a)[8] allows a depreciation deduction for the exhaustion, wear and tear of property used in business or for the production of income, and section 38(a)[9] specifies allowable investment tax credits for investments in depreciable (or amortizable) tangible personal property, pursuant to section 48(a)(1).[10]

Petitioners bear the burden of proving that Heartbeat Associates was engaged in an activity for profit and, thus, that the taxpayers are not required to pay any tax deficiencies. *See* Rule 142(a); *Taube v. Commissioner*, 88 T.C. 464, 480 (1987). The tax court found that the taxpayers failed to carry their burden. The court's determination of the taxpayer's primary motivation is a question of fact. *Jasionowski v. Commissioner*, 66 T.C. 312, 319 (1976). Thus, the factual determinations will not be set aside on review unless the tax court's findings are clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Polakof v. Commissioner*, 820 F.2d 321, 323 (9th Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

---

4. Section 183(a) provides:
      (a) **General rule.**—In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.
   I.R.C. § 183(a) (1986).

5. Section 183(c) provides:
      (c) **Activity not engaged in for profit defined.**—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.
   I.R.C. § 183(c) (1986).

6. Section 162 provides, in relevant part, that:
      (a) **In general.**—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.
   I.R.C. § 162(a) (1986).

7. Section 212 provides, in relevant part, that:
      In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—
      (1) for the production or collection of income;
      (2) for the management, conservation, or maintenance of property held for the production of income.
   I.R.C. § 212 (1986).

8. Section 167(a) provides, in relevant part, that:
      (a) **General rule.**—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
      (1) of property used in the trade or business, or
      (2) of property held for the production of income.
   I.R.C. § 167(a) (1986).

9. Section 38(a) provides, in relevant part, that:
      (a) **Allowance of credit.**—There shall be allowed as a credit against the tax imposed by this chapter for the taxable year an amount equal to the sum of—
      (1) the business credit carryforwards carried to such taxable year,
      (2) the amount of the current year business credit, plus
      (3) the business credit carrybacks carried to such taxable year.
   I.R.C. § 38(a) (1986).

10. Section 48(a) provides, in relevant part, that:
      (a) **Section 38 property.**—
      (1) **In general.**—Except as provided in this subsection, the term "section 38 property" means—
      (A) tangible personal property.
   I.R.C. § 48(a) (1986).

committed." *Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

As the tax court correctly stated, "[t]he accepted standard in determining whether an activity is a trade or business or carried on for the production of income requires a showing that the activity was entered into with an 'actual and honest objective of making a profit.'" *Evans v. Commissioner*, 56 T.C.M. (CCH) 335, 340 (1988) (quoting *Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982), *aff'd without opinion*, 702 F.2d 1205 (D.C.Cir.1983)). In addition, while a reasonable expectation of profit is not required, a bona fide objective of realizing a profit must exist. *See Taube*, 88 T.C. at 478–79.

In determining whether the proper profit motive existed, the tax court properly examined the general partners' intent and profit objective at the time that Glass and Malamed created Heartbeat Associates and purchased *Heartbeat. See Polakof*, 820 F.2d at 323 (focus is on "dominant economic motive of the partnership, not that of the individual investors"); *Taube*, 88 T.C. at 480 (examination is of general partner's intent at beginning of transaction). After examining the applicable regulations, the tax court balanced the positive and negative factors pursuant to the regulations promulgated under section 183, which regulations list nine nonexclusive factors for determining whether an activity is engaged in for profit. These include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation. Treas. Reg. § 1.183–2(b) (1978).

The treasury regulations provide that in determining whether a profit motive exists, an objective standard must be used. The regulations emphasize that all of the facts and circumstances of each case must be taken into account. Further, a reasonable expectation of profits is not required, and it may be sufficient that there is a small chance of making a large profit. Treas.Reg. § 1.183–2(a) (1978). The regulations provide an illustration of an investor in a wildcat oil well who incurs very substantial expenditures. Pursuant to the regulations, the investor is deemed to have the proper profit objective even though the expectation of a profit might be considered unreasonable. *Id.* The regulations summarize by stating that "[i]n determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent." *Id.*

The tax court stated that it was satisfied that both Glass and Malamed were experienced in the entertainment industry. The tax court also found that before *Heartbeat* was filmed, the characteristics of the movie and the performers with their substantial credits indicated that the movie could have been profitable. In addition, the tax court found that Orion was managed by experienced individuals in the motion picture industry. The tax court, however, found that even though the motion picture industry is highly speculative, the general partners did not properly evaluate *Heartbeat's* profit potential when the partnership purchased the movie. The general partners, for example, did not review the results of the September 7, 1979, sneak preview of the movie in Denver, Colorado. Also, the general partners, upon application of objective standards, could not have had a bona fide belief that *Heartbeat* would realize gross receipts of $28.5 million, which receipts were purportedly necessary for realizing a profit.

After carefully reviewing the record, we find that the positive factors which evidence a proper profit motive outweigh any

negative factors. Unlike the tax court, we do not view the general partners' failure to obtain the results of the sneak preview of *Heartbeat* as a ponderous negative factor. Nothing in the record indicates the nature of the information obtainable from the sneak preview. Further, the results would not necessarily be a reliable indicator of the eventual success of *Heartbeat* because a movie frequently is subjected to further editing after reactions from the sneak preview have been evaluated. We also find the tax court's determination, that the partners could not have had a bona fide belief that *Heartbeat* would realize sufficient gross receipts to produce a profit, clearly erroneous.[11]

After reviewing all of the evidence, we are left with a definite and firm conviction that a mistake has been made by the tax court. We are persuaded by the factors which indicate that Heartbeat Associates had a profit motive. These include: (1) the operation of Heartbeat Associates in a business-like manner and with the maintenance of complete and accurate records; (2) the expertise and experience of the general partners, the actors, the director, the producers, and the distributor; (3) the time and the effort expended by the competent and qualified general partners who negotiated complicated loan transactions and distribution agreements; (4) the distribution arrangements for *Heartbeat* in conformance with industry standards, except that Orion's fees were lower than the prevailing fees in the industry (*compare* Brief for Appellants at 7 n. 7 (citing M. Silfen, *Counseling Clients in the Entertainment Industry* 338 (1989), which outlined fees under a "common" fee structure) *with* Appellants' App. at 361–372 (providing fee structure pursuant to the Heartbeat Associates–Orion distribution agreement)); (5) the suc-

cess of the general partners in similar film ventures engaged in for profit; (6) the purchase price of *Heartbeat* which price did not exceed the cost of its production to Orion; (7) the opportunity for Heartbeat Associates to earn a substantial ultimate profit in this highly speculative motion picture venture; (8) the adequacy of the capitalization of Heartbeat Associates; and (9) the lack of hobby or recreational aspects to the ownership and promotion of *Heartbeat*.

In essence, we think the Commissioner and the tax court seek to apply a hindsight analysis based upon actual gross receipts from the showings of the film. Therefore, several items of evidence advanced in support of a deficiency are really of marginal or no relevance.

## III. CONCLUSION

For the reasons stated herein, we reverse the tax court's findings as clearly erroneous. We hold that Heartbeat Associates had the requisite profit objective. In light of this decision, we also reverse the tax court's imposition of a penalty interest rate for the alleged "tax motivated transaction" because it is not applicable to the taxpayers.

---

**11.** The tax court stated that gross receipts of $28.5 million would be necessary for the limited partners to realize profit. *See Evans*, 56 T.C.M. (CCH) at 341. The court based this determination on the private offering memorandum which indicated that the limited partners would begin to recoup their investment when the gross receipts reached $4 million, but would not fully recoup their investments until gross receipts reached $28.5 million. Appellants' App. at 165.

The promotional materials also emphasized that if *Heartbeat* generated $8 million in gross receipts, a limited partner in the 60% tax bracket stood to recoup his cash investment, even after the recapture of excess depreciation. *Id.* at 298. Thus, it is unclear what amount of gross receipts would be necessary for the limited partners to recoup their investments, all factors considered.