T.C. Memo. 1999-208


UNITED STATES TAX COURT


DEAN L. AND CYNTHIA D. SANDERS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24707-96.             Filed June 22, 1999.


P, a wealthy businessman, engaged in the activity
of showing and selling cutting horses, incurring
substantial losses during the years in issue, and
during preceding and following years.
<u>Held</u>: Losses disallowed; the activity was not an
activity engaged in for profit; P undertook and carried
on the activity primarily as a hobby.
<u>Held</u>, <u>further</u>, Ps are liable for sec. 6662
accuracy-related penalties.


<u>Thomas L. Overbey</u> and <u>D. Derrell Davis</u>, for petitioners.

<u>Edith F. Moates</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, <u>Judge</u>:  By notice of deficiency dated September 10, 1996, respondent determined deficiencies in petitioners' Federal income taxes and accuracy-related penalties as follows:

| Year | Deficiency | Accuracy-related penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1992 | $74,903 | $14,981 |
| 1993 | 121,151 | 24,230 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are:  (1) Whether petitioner Dean L. Sanders' Schedule F activity constituted an activity not engaged in for profit within the meaning of section 183(a), and (2) whether petitioners are liable for section 6662(a) accuracy-related penalties on account of negligence or disregard of rules or regulations.[1]

---

[1]    On brief, petitioners also raise certain issues that depend on our finding that petitioner Dean L. Sanders' Schedule F activity was engaged in for profit.  Since we do not make that finding, we need not address those additional issues.

FINDINGS OF FACT

Introduction

Some facts have been stipulated and are so found. The stipulation of facts, with attached exhibits, is incorporated herein by this reference.

Petitioners are husband and wife who, at the time the petition was filed, resided in Bentonville, Arkansas. Petitioners made joint returns of income for their taxable (calendar) years 1992 and 1993 (the 1992 and 1993 returns, respectively). Hereafter, we shall use the term "petitioner", in the singular, to refer only to petitioner Dean L. Sanders.

During 1992 and 1993, petitioner's principal source of income was from his employment as chief executive officer of the Sam's Club division of Wal-Mart Stores, Inc. (Wal-Mart). On the 1992 and 1993 returns, petitioners reported substantial income from petitioner's employment by Wal-Mart and from other sources. On those returns, they also reported "net farm losses" of $213,838 and $269,913, respectively. Those losses are detailed on Schedules F, Profit or Loss From Farming, attached to the 1992 and 1993 returns (the 1992 and 1993 Schedules F, respectively). On the 1992 and 1993 Schedules F, petitioners identify the principal activity as "cattle & horses". We shall refer to the activity giving rise to the losses shown on the 1992 and 1993 Schedules F as "the Schedule F activity".

Petitioner began working for Wal-Mart while he was in college, and he retired from Wal-Mart after 25 years of service in 1995.

Schedule F Results

The 1992 and 1993 Schedules F show the following items of income, deductions, and losses:

|  | 1992 | | 1993 | |
|---|---|---|---|---|
| **Farm Income** | | | | |
| Livestock, produce, grains, and products raised | $7,000 | | -- | |
| Other income | 36,801 | | $21,228 | |
| Gross income | | $43,801 | | $21,228 |
| | | | | |
| **Farm Expenses** | | | | |
| Custom hire | 4,675 | | 11,286 | |
| Depreciation | 73,601 | | 83,327 | |
| Feed | 22,907 | | 21,140 | |
| Fertilizers | -- | | 2,731 | |
| Gasoline | 4,167 | | 4,651 | |
| Insurance | 6,225 | | 5,047 | |
| Interest | 29,478 | | 25,409 | |
| Labor | 31,752 | | 39,130 | |
| Repairs | 7,808 | | 8,417 | |
| Supplies | 12,105 | | -- | |
| Taxes | 3,494 | | 6,266 | |
| Utilities | 2,426 | | 4,992 | |
| Veterinary | 3,482 | | 6,672 | |
| Horse show expenses | 47,722 | | 41,088 | |
| Legal & accounting | 520 | | 560 | |
| Sale expenses | 950 | | -- | |
| Horse shoeing | 1,230 | | -- | |
| Tenant house | 3,243 | | -- | |
| Dues | -- | | 210 | |
| Practice work | -- | | 12,277 | |
| Travel | -- | | 14,897 | |
| Meals & ent.@ 80% | 1,854 | | 3,041 | |
| Total expenses | | 257,639 | | 291,141 |
| | | | | |
| Net farm profit (or loss) | | (213,838) | | (269,913) |

The item "Livestock, produce, grains, and products raised" of $7,000 for 1992 is proceeds from the sale of one or more horses. The item "Other income" of $36,801 and $21,228 for 1992 and 1993, respectively, is proceeds (winnings) from horse shows.

During 1992, petitioner sold another two horses (not reported on the 1992 Schedule F), one at a gain of $534 and one at a loss of $7,260. During 1993, petitioner sold three horses (not reported on the 1993 Schedule F), all at a gain, for a total gain of $21,507.

Schedules F attached to petitioners' joint returns for 1986 through 1996 show income, deductions, and losses as follows:

| Year | Income | Deductions | Loss |
|------|--------|-----------|------|
| 1986 | $18,282 | $54,165 | $35,883 |
| 1987 | 225 | 51,394 | 51,169 |
| 1988 | 1,571 | 98,706 | 97,135 |
| 1989 | 6,539 | 123,517 | 116,978 |
| 1990 | 16,494 | 164,907 | 148,413 |
| 1991 | 30,107 | 171,709 | 141,602 |
| 1992 | 43,801 | 257,639 | 213,838 |
| 1993 | 21,228 | 291,141 | 269,913 |
| 1994 | 66,137 | 307,478 | 241,341 |
| 1995 | 54,312 | 422,587 | 368,275 |
| 1996 | 27,106 | 120,794 | 93,688 |

Each year's income is composed of one or two categories: "Sales of livestock, produce, grains, and other products you raised"; or "Other income". Petitioners began claiming expenses for horse shows beginning in 1987. For 1987 through 1996, petitioner's horse show expenses, gross income reported from horse shows, and the excess (except for 1994 and 1996) of horse show expenses over horse show income were follows:

| Year | Income | Expenses | Excess |
|------|--------|----------|--------|
| 1987 | $0 | $299 | $299 |
| 1988 | 1,571 | 8,010 | 6,439 |
| 1989 | 3,781 | 17,419 | 13,638 |
| 1990 | 12,971 | 44,451 | 31,480 |
| 1991 | 14,431 | 39,913 | 25,482 |
| 1992 | 36,801 | 42,722 | 5,921 |
| 1993 | 21,228 | 41,088 | 19,860 |
| 1994 | 61,637 | 54,707 | (6,930) |
| 1995 | 54,312 | 67,079 | 12,767 |
| 1996 | 27,106 | 23,400 | (3,706) |
| | 233,838 | 339,088 | 105,250 |

Horse Sales

Petitioner realized the following gains and losses from sales of horses from July 1, 1990, through June 1, 1996:[2]

| Year | Number of Horses Sold | Gain (Loss) |
|------|-----------------------|-------------|
| 1990 | 3 | $14,667 |
| 1991 | 0 | -- |
| 1992 | 2 | (6,726) |
| 1993 | 3 | 21,507 |
| 1994 | 1 | 5,392 |
| 1995 | 8 | 177,808 |
| 1996 | 2 | 97,086 |
| | | 309,734 |

History of the Schedule F Activity

Beginning in 1985, petitioner entered into an activity with a friend and co-worker Tom Coughlin (Coughlin). Petitioner and Coughlin purchased 50 or more acres in Arkansas, improved it, named it the "C&S Ranch" (the Arkansas ranch), and conducted a "cow and calf operation" thereon. They also grew and sold fescue

---

[2]    The parties have stipulated the displayed data. They have also stipulated that petitioners reported an additional $7,000 of proceeds from the sales of horses on the 1992 Schedule F. Since we cannot determine whether those proceeds represent a gain or a loss, we shall disregard them in our discussion of gains and losses realized from sales of horses.

seed and hay. In 1988, they changed their operation to one involving horses. On September 18, 1991, petitioner purchased Coughlin's interest in the Arkansas ranch for $12,905 and, subsequently, changed the name of the ranch to the "Dean Sanders Ranch". Also during 1991, petitioner and Coughlin sold the last horses that they jointly owned. During 1992 and 1993, petitioner bought yearling horses, trained them, took them to various horse shows, and sold them. Petitioner had begun purchasing horses on his own account in 1988.

In late 1993, in connection with petitioner's anticipated retirement from Wal-Mart, petitioners decided to relocate to Texas. In 1996, petitioners purchased a 212-acre ranch, the "Diamond Spur Ranch", in Anderson, Texas (the Texas ranch). On May 1, 1996, petitioners formed two limited liability companies: "Dean Sanders Cutting Horse Ranch, LLC", which lists its principal business activity as horse breeding and training and "Dean and Cindy Sanders Ranch, LLC", which lists its principal business activity as real estate. At the time of trial (February 23 and 24, 1998), the Arkansas ranch was listed for sale for $1.5 million.

Quarter Horses; Cutting Horses

A cutting horse is a quarter horse that is trained to work with cattle. Cutting horses and their riders compete in competitions for which prize money is awarded. Quarter horses may be bred and their offspring sold. Stallions may be stood and a stud fee charged. Fees may be charged for training quarter horses to be cutting horses. Petitioner bred no horses at the Arkansas ranch. From 1986 through 1995 petitioners reported no stud fees on their income tax returns. During 1992 and 1993, petitioner employed Scott Brewer (Brewer) as a trainer. Petitioner assisted with the training and performed some manual labor on the Arkansas ranch. During 1992, petitioner allowed Brewer to train outside horses on the Arkansas ranch. Petitioner billed for that service but kept only $150 out of $6,142 billed, the remainder going to Brewer. Petitioners reported no income from training for 1993.

Competitions

During 1992 and 1993, Brewer rode as a professional on petitioner's horses at cutting horse competitions. Petitioner paid him 50 percent of his winnings net of entry fees. During those years, petitioner rode in such competitions as an amateur or nonprofessional. In those categories, petitioner also could earn prize money. Petitioner has competed in all the major

cutting horse competitions and claims to have been one of the top nonprofessionals.

## Petitioner's Plan

Petitioner had no written business plan for the Schedule F activity. Petitioner intended to buy quarter horses, train them to be cutting horses, show them, establish their reputations, and sell them. He intended to devote more time to the Schedule F activity following his retirement from Wal-Mart.

## Record Keeping

During the years at issue, petitioner prepared neither profit and loss statements nor written projections of income or loss for the Schedule F activity. He maintained no records of the expenses associated with, or the winnings on account of, particular horses. Petitioner maintained a separate checking account for the Schedule F activity. Nevertheless, petitioners often wrote checks on their personal account with respect to the Schedule F activity. Petitioner wife received the bank statements with respect to the Schedule F activity checking account. She did not always open those statements, nor did she always reconcile the statements with the check book.

## Advertising

Prior to and during the years in issue, petitioner did no advertising with respect to the Schedule F activity. The horses

he sold were sold at auction, following the appearance of a horse in a competition.

Petitioner's Participation in the Schedule F Activity

During 1992 and 1993, petitioner worked an average of 50 to 55 hours a week for Wal-Mart. He spent 15 to 18 hours a week in connection with the Schedule F activity. On weekends, he also spent time on his houseboat. Petitioner went bird hunting 8 to 10 days a year.

Petitioners' Residence

Petitioners resided on the Arkansas ranch, in a house of approximately 5,700 square feet, containing four bedrooms and five bathrooms. The house also had a pool and Jacuzzi.

Respondent's Adjustments

Respondent disallowed the total expenses ($257,639 and $291,141 for 1992 and 1993, respectively) claimed on the 1992 and 1993 Schedules F.[3] Respondent explained his disallowance on the ground that the Schedule F activity was not engaged in for profit.

---

[3] Respondent made compensating adjustments to petitioners' itemized deductions to reflect the deductions allowable under sec. 183(b). Assuming we sustain respondent's primary adjustments, those compensating adjustments are not in question.

OPINION

I. Deficiencies

    A. Issue

The issue we must address is whether the net farm losses claimed by petitioners on their 1992 and 1993 Federal income tax returns result from an activity not engaged in for profit, as that term is used in section 183.

    B. Section 183: For-Profit Requirement

In pertinent part, section 183(a) provides: "In the case of an activity engaged in by an individual * * * if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(c) provides: "For purposes of this section, the term 'activity not engaged in for profit' means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Deductions are allowable under section 162 for expenses of carrying on activities that constitute a trade or business of the taxpayer and under section 212 for expenses incurred in connection with activities engaged in for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. No deductions are allowable under sections 162 or 212 for the expenses of an activity that is carried on

primarily as a sport, hobby, or for recreation. Thus, an activity carried on primarily for any such purpose is not an activity engaged in for profit. See sec. 1.183-2(a), Income Tax Regs.

C. Actual and Honest Profit Objective

An activity is engaged in for profit if the taxpayer has an "actual and honest objective of making a profit." Keanini v. Commissioner, 94 T.C. 41, 46 (1990) (quoting Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983)). Although the expectation of profit need not be reasonable, a bona fide profit objective must exist. See Keanini v. Commissioner, supra; Dreicer v. Commissioner, supra; Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs. Profit in this context means economic profit, independent of tax savings. See Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Hulter v. Commissioner, 91 T.C. 371, 393 (1988).

The regulations promulgated under section 183 provide the following nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his or her advisers, (3) the

time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or loss with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) whether elements of personal pleasure or recreation are involved.  Sec. 1.183-2(b), Income Tax Regs.  No single factor is determinative. See Keanini v. Commissioner, supra at 47; Taube v. Commissioner, 88 T.C. 464, 479-480 (1987); sec. 1.183-2(b), Income Tax Regs. Petitioner's objective is a question of fact to be determined from all the facts and circumstances, keeping in mind that petitioners bear the burden of proof.  See Rule 142(a); Evans v. Commissioner, 908 F.2d 369, 372-373 (8th Cir. 1990), revg. T.C. Memo. 1988-468; sec. 1.183-2(a), Income Tax Regs.

D.  Analysis

1.  Nature of the Schedule F Activity

Petitioner became a part owner of a ranch (the Arkansas ranch) in 1985.  He and another individual used the Arkansas ranch to raise cattle, horses, and crops, which they sold.  In 1991, petitioner purchased the other individual's interest in the Arkansas ranch and ended his relationship with that individual (with respect to the ranch).  Petitioner began purchasing horses

for his own account in 1988. His plan was to buy quarter horses, train them to be cutting horses, show them, establish their reputations, and sell them. The shows petitioner planned to enter were competitions for cash prizes. Petitioner entered his horses in such competitions from 1987 through 1996. Petitioner sold 19 horses from July 1, 1990, through June 1, 1996. Petitioner made only $150 from training other persons' horses. The nature of petitioner's activity during the years in issue (the Schedule F activity) was the showing of and sale of cutting horses.

### 2. Not an Activity Engaged in for Profit

The Schedule F activity resulted in substantial losses, not only during the years in issue, but also during preceding and following years.

During the years in issue, petitioner sold five horses, two in 1992 and three in 1993, and had a net loss and a net gain of $6,726, and $21,507, respectively. Thus, for the years in issue, petitioner realized a net gain of $14,781 from the sale of horses ($14,781 = $21,507 - $6,726). His horse show expenses for 1992 and 1993 exceeded his horse show income for those years. His net farm losses for the 2 years were $213,838 and $269,913, as reported on the 1992 and 1993 Schedules F, respectively, for a total of $483,751. Thus, for 1992 and 1993, petitioner incurred

expenses of $483,751 to generate a net gain from sales of horses of $14,781.

Petitioners did not report any gains or losses from the sale of horses on their 1987 through 1989 Federal income tax returns. From July 1, 1990, through June 1, 1996, petitioner's net gain from horse sales was $309,734. The first year in which petitioners claimed a deduction for horse show expenses in calculating their Schedule F net farm loss was 1987. From 1987 through 1996, petitioners reported Schedule F net farm losses of $1,742,352. Those losses included a net excess of horse show expenses over horse show income of $105,250. Thus, for 1987 (when petitioner's horse show expenses commenced) through 1996, petitioner incurred expenses of $1,742,352 to generate a net gain from sales of horses of $309,734.

Notwithstanding that the Schedule F activity was not profitable for any year in which petitioner operated it on the Arkansas ranch, it is quite clear that, if petitioner entered into it, or continued it, with the actual and honest objective of making a profit, it would be an activity engaged in for profit within the meaning of section 183. See Dreicer v. Commissioner, supra at 644-645; sec. 1.183-2(a), Income Tax Regs. If, on the other hand, petitioner engaged in the Schedule F activity primarily as a sport, hobby, or for recreation, petitioner would

not have engaged in the activity for profit. See sec. 1.183-2(a), Income Tax Regs.

Petitioner is a wealthy, successful businessman. Petitioner testified that he and his wife had long planned that he would leave Wal-Mart when he was 45 years old. Petitioner began working for Wal-Mart when he was in college and retired after 25 years, in 1995, when, we assume, he was approximately 45 years old. In 1985, petitioner acquired an interest in the Arkansas ranch. In 1987, petitioner began what we have characterized as the Schedule F activity. In 1996, following his retirement from Wal-Mart, petitioner moved to Texas and formed a limited liability company to engage in the business of horse breeding and training. The Texas ranch was substantially bigger than the Arkansas ranch. We believe that during the years in issue petitioner undertook and carried on the Schedule F activity primarily as a hobby. We reach that conclusion taking into account petitioner's statement of his intent but giving greater weight to the factors set forth in the regulations, in light of the facts before us. Most prominently, the Schedule F activity failed to generate even occasional profits, a factor to be taken account of under section 1.183-2(b)(7), Income Tax Regs., which failure did not seem paramount to petitioner, a wealthy businessman, another factor to be taken into account, under section 1.183-2(b)(8), Income Tax Regs. In the following

paragraphs, we detail our analysis of the remaining factors found in the regulations, which weigh in our conclusion.

### 3. History of Losses

"Although no one factor is determinative of the taxpayer's intention to make a profit * * * a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention." Golanty v. Commissioner, 72 T.C. at 426; see also sec. 1.183-2(b)(6), Income Tax Regs. As we have detailed, petitioner incurred substantial losses in the Schedule F activity for each of the 10 years that it was carried on at the Arkansas ranch.

When a taxpayer's losses occur during the startup period of an activity, the losses have been held not to indicate the absence of a profit motive. See Engdahl v. Commissioner, 72 T.C. 659, 669 (1979) (unremitting losses were not an indication of lack of profit motive where years in issue fell within startup period of horse breeding activity). Petitioners reported Schedule F losses in connection with the Arkansas ranch beginning in 1986. They reported losses in connection with the Schedule F activity beginning in 1987 (when petitioners first claimed a deduction for horse show expenses) and continuing through petitioner's move to the Texas ranch in 1996. Petitioner had no written plan for the Schedule F activity, and he has failed to

prove that the Schedule F activity was within the anticipated startup phase of an activity conducted for profit. As stated, we think that the Schedule F activity was in the nature of a hobby.

4. Manner In Which Taxpayer Carries on Activity

"The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit." Sec. 1.183-2(b)(1), Income Tax Regs.

Petitioner did not keep formal or accurate books and records for the Schedule F activity. Petitioner's only records consisted of canceled checks, invoices for goods and services received, and bills. While a taxpayer need not maintain a sophisticated cost accounting system, the taxpayer should keep records that enable the taxpayer to make informed business decisions. See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523. Petitioner's failure to maintain books of account, reconcile his bank statement every month (or even open the envelopes containing the statement and canceled checks), or use checks only from the account dedicated to the Schedule F activity evidences a lack of concern for cash-flow. Also, petitioner did not keep records respecting the costs associated with individual horses. See Dodge v. Commissioner, T.C. Memo. 1998-89 (without records according to individual horses, taxpayers had no way of knowing which horses were more profitable or which training

regimen was successful at increasing the value of the horses).
As in Dodge, it appears that petitioners retained what they
thought were the minimum records necessary to prepare their tax
returns. Petitioner's bookkeeping practices were more consistent
with the Schedule F activity's being a hobby than a profit-
motivated business.

Petitioner lacked a written plan. A business plan does not
have to be a financial plan or a written budget; it may be
evidenced by a taxpayer's actions. See Phillips v. Commissioner,
T.C. Memo. 1997-128. Petitioner's intent was to buy quarter
horses, train them to be cutting horses, show them, establish
their reputation, and sell them. Petitioner acted in accordance
with that intent, but that does not establish that he was engaged
in a business for which he had a plan for success (i.e.,
profitability). Given the substantial, but expected, costs
associated with the Schedule F activity, we need more than
petitioner's representation that he could make money if he sold
enough horses at high enough prices to conclude that petitioner
had a plan to make a profit. See Ballard v. Commissioner, T.C.
Memo. 1996-68 (taxpayer testified as to his business plan, yet
did not conduct activity in businesslike manner).

Prior to and during the years in issue, petitioner did not
advertise the Arkansas ranch or his horses in trade magazines or
publications. While we recognize that horse shows may be one

method of advertising horses for sale, e.g., Engdahl v. Commissioner, supra at 667, petitioner's failure to attempt to reach a larger customer base is not consistent with a profit motive. See Dodge v. Commissioner, supra.

"A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive." Sec. 1.183-2(b)(1), Income Tax Regs. Petitioners argue that petitioner made changes in his operating methods that indicate a profit motive. There is no evidence that most of the changes petitioners refer to, such as, the cattle weight gain program, taking on outside horses,[4] instituting a breeding program, and maintaining the breeding rights to mares sold, were implemented prior to or during the years in issue. Subsequent actions do not materially impact this aspect of our analysis under section 183 for the years in issue. See Borsody v. Commissioner, T.C. Memo. 1993-534, affd. per curiam 92 F.3d 1176 (4th Cir. 1996). While we agree that hiring a trainer and leasing cattle may have been more cost effective, we are not persuaded that petitioner implemented methods to control his losses. See Dodge v. Commissioner, supra.

---

[4] While petitioner did take on outside horses at the Arkansas ranch, he did not actively pursue that aspect of his activity. During 1992 and 1993, petitioner obtained only $150 of net income from outside horses.

We find that petitioner did not carry on the activity in a businesslike manner.

### 5. Expertise of Taxpayer or His Advisors

"Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices." Sec. 1.183-2(b)(2), Income Tax Regs. While petitioner received free and paid advice from individuals he considered "experts" in the cutting horse industry, the advice did not focus on the economic aspects of the activity. The advice which petitioner received on profitable bloodlines and which horses to sell is consistent with a hobbyist's motives. Taken as a whole, we find this factor to be neutral.

### 6. Time and Effort

"The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit." Sec. 1.183-2(b)(3), Income Tax Regs. During 1992 and 1993, petitioner spent 15 to 18 hours a week in connection with the Schedule F activity. He employed a professional trainer, but he testified that he also helped with training. Petitioner managed the

Schedule F activity, and he performed manual labor on the Arkansas ranch. He attended a number of competitions and testified: "I have competed in all the major events, have been successful, and have been one of the top non-pros in the United States." While we acknowledge petitioner's substantial contribution of time to the Schedule F activity during the years in issue, we believe that petitioner's success as a nonprofessional was a source of pride to him, which, although not inconsistent with an intent to make a profit, serves to explain, in part, the time and money he poured into a then losing proposition.

### 7. Expectation of Appreciation

"The term 'profit' encompasses appreciation in the value of assets, such as land, used in the activity." Sec. 1.183-2(b)(4), Income Tax Regs. That provision of the regulations also provides:

> Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. * * * [Id.]

Section 1.183-1(d)(1), Income Tax Regs., however, provides:

> If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183. * * * the farming and

holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land * * *.

At the time of trial, the Arkansas ranch was on the market for $1.5 million. Petitioners argue the unrealized appreciation in the Arkansas ranch should be taken into account in determining the profitability of the Schedule F activity. We disagree. Petitioner's investment in the land encompassing the Arkansas ranch was an activity separate from the Schedule F activity. The Schedule F activity did not produce profits that reduced the net costs of carrying the land.

### 8. Elements of Personal Pleasure or Recreation

"The presence of personal motives in * * * carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Sec. 1.183-2(b)(9), Income Tax Regs. Clearly, petitioner took pride in his competitive abilities and, we assume, enjoyed the competitions. Petitioner and his wife lived on the Arkansas ranch, in a 5,700-square foot house with a pool. They moved there prior to his retirement from Wal-Mart. Depreciation schedules attached to Schedules F for 1988 through 1995 show a substantial investment in physical improvements to the ranch: Depreciation is the largest expense item listed on petitioners' Schedules F for 9 out of the 10 years, 1986 through

1995.  We believe that petitioners enjoyed the ranch lifestyle, were wealthy enough to indulge that lifestyle without too much concern for costs (remember, they did not always open their bank statements), and, at least during their years on the Arkansas ranch, viewed the Schedule F activity as an integral part of that lifestyle (without regard to profitability).

### 9.  Success in Similar Activities

Petitioner did not demonstrate success in carrying on any similar activity.  See sec. 1.183-(2)(b)(6), Income Tax Regs.

### E.  Conclusion

During the years in issue, the Schedule F activity was not an activity engaged in for profit.  Respondent's determination of a deficiency based on that determination is sustained.

## II.  Section 6662(a) Accuracy-Related Penalties

Section 6662 provides for an accuracy-related penalty in the amount of 20 percent of the portion of any underpayment attributable to, among other things, negligence or intentional disregard of rules or regulations (hereafter, simply, negligence).  Respondent determined section 6662 penalties against petitioners for their negligence in deducting the farm losses shown on the 1992 and 1993 Schedules F.  Negligence has been defined as the failure to exercise the due care of a reasonable and ordinarily prudent person under like circumstances.  See Neely v. Commissioner, 85 T.C. 934, 947

(1985). In the petition, petitioners assign error to respondent's determination of section 6662 penalties.  However, petitioners do not aver any specific facts in support of their assignment of error.  In their opening brief, petitioners recognize that respondent determined section 6662 penalties, but they propose no findings of fact specifically relating to that issue, nor do they make any argument with respect to the issue.  In response to respondent's opening brief, petitioners argue only that they maintained and produced adequate records of the Schedule F activity.  Petitioners bear the burden of proving that they were not negligent or that they had reasonable cause for the underpayment and that they acted in good faith.  See sec. 6664(c)(1); Rule 142(a).  We assume that, in defense to respondent's determination of a penalty, petitioners rely principally on the assumption that we shall determine no deficiency on account of our finding that the Schedule F activity was engaged in for profit.  We have not made that finding and have sustained respondent's adjustments with respect to the Schedule F activity.  Respondent's determination of a section 6662 penalty is therefore sustained.

<u>Decision will be entered for respondent</u>.